UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
AIKEN DIVISION

| | | |
|---|---|---|
| James N. Bryant, III, | ) | Civil Action No. 1:13-2665-BHH |
| | ) | |
| Petitioner, | ) | |
| vs. | ) | |
| | ) | **Opinion and Order** |
| Bryan P. Stirling, Commissioner, | ) | |
| South Carolina Department of | ) | |
| Corrections; Warden, Kirkland | ) | |
| Correctional Institution, | ) | |
| | ) | |
| Respondents. | ) | |

Petitioner, James N. Bryant ("Petitioner"), represented by counsel and under a sentence of death, seeks habeas corpus relief pursuant to 28 U.S.C. § 2254. This action is before the Court on Petitioner's amended petition for writ of habeas corpus and Respondents' motion for summary judgment.  (ECF Nos. 65 and 73.) In accordance with 28 U.S.C. § 636(b)(1)(B) and Local Civil Rule 73.02(B)(2)(c), D.S.C., this matter was referred to United States Magistrate Judge Shiva V. Hodges, for pre-trial proceedings and a Report and Recommendation ("Report"). On July 26, 2018, Judge Hodges issued a Report recommending that Respondents' motion for summary judgment be granted and the amended petition for writ of habeas corpus be denied and dismissed with prejudice. (ECF No. 86.)

Petitioner filed objections on August 29, 2018 (ECF No. 89), and Respondents replied on September 12, 2018 (ECF No. 90). The Report sets forth the relevant factual and procedural background (ECF No. 86 at 4-14), which the Court incorporates herein

without recitation.[1] For the reasons set forth herein, the Court overrules Petitioner's objections with respect to Grounds Four through Nine of the amended petition, **ACCEPTS** the Magistrate Judge's Report as to Grounds Four through Nine, sustains Petitioner's objections with respect to Grounds One and Two of the amended petition, and **REJECTS** the Report as to Grounds One and Two. (ECF No. 86.) Therefore, the Court **GRANTS** Respondents' motion for summary judgment as to Grounds Four through Nine, and **DENIES** the motion as to Grounds One and Two. (ECF No. 73.) Consequently, the Court **GRANTS** Petitioner's amended petition for writ of habeas corpus as to Grounds One and Two. (ECF No. 65.)

## I. LEGAL STANDARD

### A. The Magistrate Judge's Report and Recommendation

The Magistrate Judge makes only a recommendation to the Court. The recommendation has no presumptive weight. The responsibility to make a final determination remains with the court. *Mathews v. Weber*, 423 U.S. 261, 270–71 (1976). The Court is charged with making a *de novo* determination of those portions of the Report to which specific objection is made, and the Court may accept, reject, or modify, in whole or in part, the recommendation of the Magistrate Judge, or recommit the matter with instructions. 28 U.S.C. § 636(b)(1). However, the Court need not conduct a *de novo* review when a party makes only "general and conclusory objections that do not direct the court to a specific error in the magistrate's proposed findings and recommendations." *Orpiano v. Johnson*, 687 F.2d 44, 47 (4th Cir. 1982). In the absence of a timely filed,

---

[1] As always, the Court says only what is necessary to address Petitioner's objections against the already meaningful backdrop of the Magistrate Judge's thorough Report; exhaustive recitation of law and fact exist there.

specific objection, the Magistrate Judge's conclusions are reviewed only for clear error. *See Diamond v. Colonial Life & Accident Ins. Co.*, 416 F.3d 310, 315 (4th Cir. 2005).

**B. <u>Summary Judgment Standard</u>**

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). It is well established that summary judgment should be granted "only when it is clear that there is no dispute concerning either the facts of the controversy or the inferences to be drawn from those facts." *Pulliam Inv. Co. v. Cameo Properties*, 810 F.2d 1282, 1286 (4th Cir. 1987).

The party moving for summary judgment has the burden of showing the absence of a genuine issue of material fact, and the Court must view the evidence before it and the inferences to be drawn therefrom in the light most favorable to the nonmoving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962). When a respondent is the moving party and the petitioner has the ultimate burden of proof on an issue, the respondent must identify the parts of the record that demonstrate the petitioner lacks sufficient evidence. The nonmoving party must then go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *see* Fed. R. Civ. P. 56(c).

A party "cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another." *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1985). Therefore, "[m]ere unsupported speculation . . . is not enough to defeat a summary judgment motion." At *Ennis v. National Ass'n of Bus. & Educ. Radio*, Inc., 53

F.3d 55, 62 (4th Cir. 1995).

## C. Section 2254 Standard

Because Petitioner filed the petition after the effective date of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), his claims are governed by 28 U.S.C. § 2254(d), as amended. *Lindh v. Murphy*, 521 U.S. 320 (1997). Section 2254 "sets several limits on the power of a federal court to grant an application for a writ of habeas corpus on behalf of a state prisoner." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011). For instance, § 2254 authorizes review of only those applications asserting a prisoner is in custody in violation of the Constitution or federal law and only when, except in certain circumstances, the prisoner has exhausted remedies provided by the State. *Id*.

When a § 2254 petition includes a claim that has been adjudicated on the merits in a State court proceeding, § 2254 provides that the application shall not be granted with respect to that claim, unless the State court's adjudication of the claim:

(1)    resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or

(2)    resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). "This is a 'difficult to meet,' and 'highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt.'" *Pinholster*, 563 U.S. at 181 (internal citations omitted) (quoting *Harrington v. Richter*, 562 U.S. 86, 102 (2011); *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (per curiam)).

The Fourth Circuit Court of Appeals recently explained proper application of these standards as follows:

Under § 2254(d)(1), such a decision is "contrary to" Supreme Court precedent "if the state court applied a rule that contradicts the governing law set forth in" Supreme Court cases, or "confronted a set of facts that are materially indistinguishable from a Supreme Court decision and nevertheless arrive[d] at a result different from [that] precedent." *Williams v. Taylor*, 529 U.S. 362, 405–06, 120 S. Ct. 1495, 146 L.Ed.2d 389 (2000). A decision is an "unreasonable application" of clearly established Supreme Court precedent if the PCR court "correctly identified the governing legal rule but applied it unreasonably to the facts of a particular prisoner's case." *Id.* at 407–08, 120 S. Ct. 1495. "In order for a federal court to find a state court's application of Supreme Court precedent unreasonable, the state court's decision must have been more than incorrect or erroneous. The state court's application must have been objectively unreasonable." *Wiggins*, 539 U.S. at 520–21, 123 S. Ct. 2527 (internal citation and quotation marks omitted); *see also Harrington v. Richter*, 562 U.S. 86, 103, 131 S. Ct. 770, 178 L.Ed.2d 624 (2011) ("[A] state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.").

Alternatively, a state prisoner may be granted relief pursuant to § 2254(d)(2) if the PCR court['s] decision[] was based on a factual determination "sufficiently against the weight of the evidence that it is objectively unreasonable." *Winston v. Kelly*, 592 F.3d 535, 554 (4th Cir. 2010). As with legal conclusions, "for a state court's factual determination to be unreasonable under § 2254(d)(2), it must be more than merely incorrect or erroneous." *Id.* (internal citation omitted).

*Williams v. Stirling*, 914 F.3d 302, 311–12 (4th Cir. 2019), *as amended* (Feb. 5, 2019) (modifications omitted).

### D. <u>Ineffective Assistance of Counsel</u>

The Sixth Amendment to the United States Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." U.S. Const. amend. VI. The United States Supreme Court has held that this right is violated when counsel retained by, or appointed to, a criminal defendant fails to provide adequate or effective legal assistance. *See Strickland v. Washington*, 466 U.S. 668, 686 (1984). *Strickland* established a two-prong test for a claim

of ineffective assistance of counsel in violation of the Sixth Amendment, under which the criminal defendant must show deficient performance and resulting prejudice. *Id.* at 687. "The performance prong of *Strickland* requires a defendant to show 'that counsel's representation fell below an objective standard of reasonableness.'" *Lafler v. Cooper*, 566 U.S. 156, 163 (2012) (quoting *Hill v. Lockhart*, 474 U.S. 52, 57 (1985)). "[C]ounsel should be 'strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment,'" and courts should indulge in a "'strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance.'" *Burt v. Titlow*, 134 S. Ct. 10, 17 (2013) (modifications omitted) (quoting *Strickland*, 466 U.S. at 689–90). "To establish *Strickland* prejudice a defendant must 'show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Lafler*, 566 U.S. at 163 (quoting *Strickland*, 466 U.S. at 694).

The standard for an ineffective assistance claim under *Strickland* in the first instance is already "a most deferential one," and "'[s]urmounting *Strickland*'s high bar is never an easy task.'" *Harrington v. Richter*, 562 U.S. 86, 105 (2011) (quoting *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010)). "Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult," because the "standards created by *Strickland* and § 2254(d) are both 'highly deferential,' and when the two apply in tandem, review is 'doubly' so." *Id.* (internal citations omitted) (quoting *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009)); *Lindh*, 521 U.S. at 333 n.7; *Strickland*, 466 U.S. at 689). "When § 2254(d) applies, the question is not whether counsel's actions were reasonable. . . . [but] whether there is any reasonable argument that counsel

satisfied *Strickland*'s deferential standard." *Richter*, 562 U.S. at 105.

E. **Procedural Default**

A petitioner's failure to raise in State court a claim asserted in his § 2254 petition "implicates the requirements in habeas of exhaustion and procedural default." *Gray v. Netherland*, 518 U.S. 152, 161 (1996). "The habeas statute generally requires a state prisoner to exhaust state remedies before filing a habeas petition in federal court." *Woodford v. Ngo*, 548 U.S. 81, 92 (2006). Thus, "[a] state prisoner is generally barred from obtaining federal habeas relief unless the prisoner has properly presented his or her claims through one 'complete round of the State's established appellate review process.'" *Id*. (quoting *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999)). In a similar vein, "a habeas petitioner who has failed to meet the State's procedural requirements for presenting his federal claims has deprived the state courts of an opportunity to address those claims in the first instance" and has procedurally defaulted those claims. *Coleman v. Thompson*, 501 U.S. 722, 732 (1991).

Absent an exception, a federal court will not entertain a procedurally defaulted claim, so long as the State procedural requirement barring the State court's review is adequate to support the judgment and independent of federal law. *See Martinez v. Ryan*, 566 U.S. 1, 9–10 (2012); *Walker v. Martin*, 562 U.S. 307, 315–16 (2011); *Beard v. Kindler*, 558 U.S. 53, 55 (2009). "Thus, if state-court remedies are no longer available because the prisoner failed to comply with the deadline for seeking state-court review or for taking an appeal, those remedies are technically exhausted, but exhaustion in this sense does not automatically entitle the habeas petitioner to litigate his or her claims in federal court." *Woodford*, 548 U.S. at 93 (internal citation omitted). Rather, "if the petitioner procedurally

defaulted those claims, the prisoner generally is barred from asserting those claims in a federal habeas proceeding." *Id.* (citing *Gray*, 518 U.S. at 162; *Coleman*, 501 U.S. at 744-51).

However, "[t]he doctrine barring procedurally defaulted claims from being heard is not without exceptions. A prisoner may obtain federal review of a defaulted claim by showing cause for the default and prejudice from a violation of federal law." *Martinez*, 566 U.S. at 10 (citing *Coleman*, 501 U.S. at 750). "In *Coleman*, . . . the Supreme Court held that . . . a federal habeas 'petitioner cannot claim constitutionally ineffective assistance of counsel in [State post-conviction] proceedings to establish cause.'" *Fowler v. Joyner*, 753 F.3d 446, 460 (4th Cir. 2014) (quoting *Coleman*, 501 U.S. at 752). Subsequently, in *Martinez*, the Supreme Court recognized a "narrow exception" to the rule stated in *Coleman* and held that, in certain situations, "[i]nadequate assistance of counsel at initial-review collateral proceedings may establish cause for a prisoner's procedural default of a claim of ineffective assistance at trial." *Martinez*, 566 U.S. at 9. The Fourth Circuit has summarized the exception recognized in *Martinez*:

> [A] federal habeas petitioner who seeks to raise an otherwise procedurally defaulted claim of ineffective-assistance-of-trial-counsel before the federal court may do so only if: (1) the ineffective-assistance-of-trial-counsel claim is a substantial one; (2) the "cause" for default "consists of there being no counsel or only ineffective counsel during the state collateral review proceeding;" (3) "the state collateral review proceeding was the initial review proceeding in respect to the ineffective-assistance-of-trial-counsel claim;" and (4) state law "requires that an ineffective-assistance-of-trial-counsel claim be raised in an initial-review collateral proceeding."

*Fowler*, 753 F.3d at 461 (internal modifications omitted) (quoting *Trevino v. Thaler*, 569 U.S. 413, 423 (2013)).

In the alternative to showing cause and prejudice, a petitioner may attempt to

demonstrate a miscarriage of justice, *e.g.*, actual innocence (*see Bousley v. United States*, 523 U.S. 614, 623 (1998) (stating that a petitioner's claim may be reviewable despite procedural default if he can establish that the constitutional error at issue "has probably resulted in the conviction of one who is actually innocent" (internal quotation marks and citation omitted)); *see also Schlup v. Delo*, 513 U.S. 298, 327–28 (1995)), or abandonment by counsel (*see Maples v. Thomas*, 565 U.S. 266, 283 (2012) (inquiring "whether [the petitioner] ha[d] shown that his attorneys of record abandoned him, thereby supplying the extraordinary circumstances beyond his control, necessary to lift the state procedural bar to his federal petition" (internal quotation marks and citations omitted)).

## DISCUSSION

Petitioner filed timely objections to the Magistrate Judge's Report on August 29, 2018. (ECF No. 89.) In his objections, Petitioner challenges the Magistrate Judge's reasoning and conclusions on Grounds One, Two, Four, Five, Six, Seven, Eight, and Nine from his amended petition. He has expressly abandoned his Third and Tenth Grounds for relief, and those claims are not addressed herein. (*See* Resp. to Mot. for Summ. J., ECF No. 78 at 16, 66; Obj., ECF No. 89 at 4, 21.) Petitioner concedes that the ineffective assistance of trial counsel claims he raises in Grounds Five, Seven, and Nine are subject to procedural default, as those claims were not previously raised to and ruled upon by the State court that adjudicated his initial post-conviction review petition ("PCR Court"). (ECF No. 78 at 35, 46, 65.) Accordingly, the Court will confine its analysis of the procedurally defaulted claims to the question whether Petitioner has made a sufficient showing to overcome the procedural bar pursuant to *Martinez v. Ryan*, 566 U.S. 1 (2012).

## A. **Ground One**

In Ground One, Petitioner alleges he was denied his right to a fair trial before an impartial jury under the Sixth, Eighth, and Fourteenth Amendments to the U.S. Constitution when he was convicted and sentenced to death by a hearing-impaired juror who did not hear portions of the trial testimony. (ECF No. 65 at 7.) After extensive recitation of the trial record pertaining to concerns about Juror 342's hearing deficiency and qualification to sit on the jury, the Magistrate Judge concluded that the PCR Court's denial of this claim was not based on unreasonable factual findings, nor was it contrary to, or did it reflect an unreasonable application of, federal law. (ECF No. 86 at 23–46.)

Petitioner argues that the evidence presented to the PCR Court about Juror 342's hearing impairment introduced facts that were unknown to the trial court at the time of trial and illustrated just how incapacitated Juror 342 really was. Specifically, Petitioner points to the PCR testimony of Juror 342's husband, stating that he "provided additional information about her inability to hear." (ECF No. 89 at 2 (citing ECF No. 69-12 at 38-40).) Petitioner objects to the Magistrate Judge's finding that Petitioner failed to demonstrate by clear and convincing evidence that the PCR Court's factual findings were unreasonable in light of the record. Petitioner argues that Juror 342 simply was not qualified to sit on Petitioner's jury, and, particularly in light of the "heightened reliability requirements of capital cases," that her participation violated his right to an impartial jury. (*See* ECF No. 89 at 2-3 (citing *Zant v. Stephens*, 462 U.S. 862 (1983); *Woodson v. North Carolina*, 428 U.S. 280 (1976); *Thompson v. Oklahoma*, 487 U.S. 815, 856 (1988) ("Under the Eighth Amendment, the death penalty has been treated differently from all other punishments").)

At the outset, the Court would note the extraordinary level of care and diligence exemplified by the Magistrate Judge throughout her exhaustive and well-reasoned Report. Nonetheless, after careful consideration, the Court sustains Petitioner's objection and rejects the Report's conclusions and recommendation as to Ground One.

### 1. Concerns About Juror 342's Hearing Impairment at Trial

The concerns with Juror 342's ability to hear began in voir dire. (*See* ECF No. 69-4 at 48–66.) Juror 342 answered various questions posed by the trial judge in a manner that could indicate difficulty hearing, *inter alia*:

> THE COURT: . . . . If you'll state your name for the record, please.
> [Juror 342]: Excuse me?
>
> . . . .
>
> Q: . . . . Did you recognize any of those potential witnesses as being related to you by blood or marriage or being personal or business acquaintances of yours?
> A: Yes, ma'am.
> Q: Who? Who is related to you by blood or marriage or who is a personal or a business acquaintance?
> A: Oh, I'm sorry, no, ma'am.
>
> . . . .
>
> Q: . . . . If you're under oath and you're told that you must apply the law as I instruct it whether you agree with it or not would you, could you do that?
> A: No, ma'am.
> Q: Okay, you would not apply the law as instructed? Is that what you're saying?
> A: Ma'am?
> Q: You would not apply the law as instructed?
> A: Oh, no, I wouldn't – answer to the best of ability, you know. I wouldn't tell nothing that's not true.
>
> . . . .
>
> Q: Could you, based on the facts and circumstances of the case and the law that I'd instruct, at that phase of the case could you find the Defendant either not guilty or guilty depending on the facts and you can't guess which

now ---

A: Yeah.

Q: --- but could, could you, based on the facts and circumstances and the law instructed, could you find the Defendant either guilty or not guilty?

A: Guilty.

Q: Okay, you're saying guilty. I'm not asking you to guess which one because you don't know the facts of the case.

A: No.

Q: I'm just saying could you find them either guilty or not guilty depending on the facts, one or the other could you find that?

A: What you [sic] saying regardless if I hear the facts or not?

Q: No, I'm saying, I'm asking you after you've heard the facts, but you don't know what they are now, can you then make a determination that he's either guilty or not guilty? That's after you've heard the facts.

A: No, ma'am.

Q: Could you do that?

A: No, ma'am.

Q: You couldn't say that he was guilty or not guilty?

A: I could say not guilty until I hear it, yes.

Q: Right, you're right. They're presumed innocent, they're presumed not guilty till you hear, but what I'm asking you is at the guilt phase you and your fellow jurors have to decide if the State met their burden of proof. If the State did not meet its burden of proof you would have to find the Defendant not guilty. Could you do that?

A: Yes, ma'am.

. . . .

Q: Okay, if you are chosen to serve as a juror in this case you will be housed in a motel during the course of the trial. It may be up to ten days. I don't anticipate it'll be that long, but I'll have you pack for ten days. Except for the personal inconvenience that this would pose would this pose any serious danger to the health or well-being of yourself or those dependent upon you?

A: Yes, ma'am.

Q: It would? Would it pose a serious danger to the health or well-being of you or someone who is dependent on you if you were in a motel?

A: No, ma'am.

Q: It won't?

A: No.

Q: Okay, now, you've answered me both ways and I need to clarify this like I've done on some of these others.

A: I understand what you're saying.

(*Id.* at 49, 52, 53, 56–58, 60.) However, these and other lapses in communication that

occurred during the trial judge's questioning of Juror 342 could have simply resulted from

Juror 342's failure to understand the trial judge's meaning, from poorly worded questions, or from other sources of confusion.

Next, the solicitor questioned Juror 342 about her responses on the questionnaire:

> Q: Okay, all right, and I notice that in the last question there about whether you had a mental or physical condition that might make you unable to serve you said that you had a hearing problem with your right ear.
> A: Yes, sir; yes.
> Q: And I notice a couple of times when the Judge was talking to you[,] you kind of put your hand up there.
> A: Yeah, so I can focus.
> Q: All right, and can you tell us – can you hear at all out of that ear?
> A: Yeah, I can hear.
> Q: Okay, can you hear me okay when I'm talking?
> A: Yes, sir.

(*Id.* at 62-63.) At the conclusion of her voir dire, both the solicitor and trial counsel[2] found Juror 342 to be qualified. (*Id.* at 67.) The trial judge then informed Juror 342 that she had been qualified to serve in a death penalty case, and needed to return to the courthouse the following Monday at ten o'clock with a bag packed for ten days. (*Id.*)

The jury was selected on Monday, October 4, 2004. (*Id.* at 119, 146–53, 167, 174.) Following the jury being sworn, the trial judge provided a number of general instructions, including the following:

> Another important hand signal, because you are the judge of the facts of the case, is this, and this means 'Judge, I cannot hear or I cannot see.' I'll figure out which one it is and I'll make sure that that witness speaks up or that attorney speaks up or I speak up or that that document or photograph or exhibit is better displayed to you, the jury.

(*Id.* at 183–84.) After the parties made opening statements and seven of the State's witnesses testified, the trial judge *sua sponte* questioned the jury, and specifically Juror

---

[2] Except where expressly noted, the Court uses the term "trial counsel" to refer Petitioner's lead defense counsel at the underlying trial. Where the Court refers to Petitioner's assistant defense counsel, it is so noted.

342, about whether they could hear properly:

> THE COURT: While we wait on [the next witness] to come, let me ask you is every member of the jury able to hear? If you are able to hear just raise your hand for me. I need to be sure that everybody is able to hear. *All right, let me ask you once again, is every member of the jury panel able to hear? Is every member of the jury able to hear? All right, I'm getting an indication that one juror is unable to hear; is that correct? Are you having difficulty hearing? You are?*
> [Juror 342]: *Yes.*
> THE COURT: Have you been having difficulty hearing throughout this trial?
> [Juror 342]: Long as I'm looking, you know, facing you I can read your lips and understand what you're saying.
> THE COURT: *All right, so, you really have to read lips to understand?*
> [Juror 342]: *Yes, ma'am.*
> THE COURT: *Because there's been plenty of times that they have turned away.* Have you heard all of the evidence and testimony in this trial?
> [Juror 342]: I heard.
> THE COURT: Okay, I don't mean to put you on the spot because we will work with you. I just want to make sure you haven't missed anything thus far. Have you heard?
> [Juror 342]: Yes, ma'am.
> THE COURT: You can, okay. All right, we need to be very mindful then that she is actually reading lips. That's assisting her. So, we'll have to be – have our witnesses actually looking that direction and facing. If at any time you don't understand or can't hear you need to let us know. Do you understand that?
> [Juror 342]: Yes, ma'am.

(ECF No. 69-5 at 86–87 (emphasis added).)

At the end of the first day of trial, the trial judge gave additional instructions to the jury, and specifically told Juror 342 that she would be escorted to get her clothes packed for ten days, because she had not packed clothes as instructed, though every other juror was packed for ten days. (*Id.* at 97–100.) Upon dismissing the jury for the evening, the trial judge openly expressed her concerns about Juror 342 to government and defense counsel:

> THE COURT: All right, I want you to know that I've got some concerns about the one juror who is lip reading. I want to be sure – *I have concerns that it was not brought to light that she really needed to lip read when we were*

*doing the individual voir dire.* She indicated she had a hearing problem but said it was taken care of, that she, in fact, could hear, but now I'm understanding that she, in fact, lip reads. Now, that would not preclude her from serving. *My concern is it hasn't come to our attention until recently and I've asked her about whether she has missed anything, but I'm going to be very mindful of that and ask that you all be very mindful of that as well.* In other words, when you're asking questions sometimes you're going to have to be looking over at that jury.

I'm going to periodically make sure that all are able to hear and watch that situation as best I can. I'm also going to hear from the SLED agents and those to see if there is – if they get any indication that she's really having difficulty even lip reading, and then if that is the case then we will address that. Hopefully that will not be the case and simply being aware of it and looking towards her and making sure that she's able to hear everything will work and that will be sufficient. I just wanted to raise that issue because I want to let you know that when they went to pick her up there was a couple of things. *She didn't hear me say that she was to pack her bags for ten days.* So, she did not pack her bags for ten days. So, she missed that, although she did hear to be here today and to be here at ten o'clock, and she did come, but she came with, I think, an aunt and a niece and without bags packed. So, she is going to have to be taken to get her bags packed. So, we've got to watch this situation pretty closely. Be aware that I'm aware of it. Anything that I hear that is reported through this court you will become, you will be made aware of it immediately if I think it's a concern about her ability to serve. We're going to try to adapt as much as we can to be sure that she's able to.

(*Id.* at 100–02 (emphasis added).)

During the next day of trial, October 5, 2004, the continuation of the guilt phase,

the trial judge again questioned the jurors about their ability to hear:

THE COURT: . . . . I have been told that lunch has arrived and ladies and gentlemen of the jury, I will allow you to go back to the jury room at this time with a reminder please do not discuss the case. Before I send you back I'm going to ask you one more time is everybody having – are there any problems seeing or hearing anything? Are you having any problems? If you're having any problems – let me put it this way, if you're not having any problems seeing or hearing raise your hand.

All right, all right, *now, ma'am, you delayed*. Can you hear, are you able to hear?
[Juror 342]: (Indicates affirmatively.) Yeah.
THE COURT: Have you been able to hear all of the testimony?
[Juror 342]: I heard them all.

(ECF No. 69-6 at 4–5 (emphasis added).) The State concluded its guilt-phase evidence later that day. (*Id.* at 74.) The Defense did not present any guilt-phase evidence. (*Id.* at 85–86.) The jury began deliberating at 4:53 p.m., and returned a guilty verdict at 5:40 p.m. (*Id.* at 123–25.)

The sentencing phase began on Thursday, October 7, 2004, following a twenty-four-hour statutory waiting period.[3] (ECF No. 69-6 at 126–31.) On Friday, October 8, 2004, the trial judge briefly interrupted the sentencing-phase proceedings and interjected the following exercise to test whether the jurors were hearing properly:

> THE COURT: While [the next witness] is coming forward let me ask is everybody able to hear? Everybody able to hear me? All right, if you're able to hear me raise your hand. All right.
> [The witness is seated by the clerk of court.]
> THE COURT: All right, ma'am, thank you. Please be seated. If you have, if you're in the jury box and you have on a yellow shirt would you stand up. You might need to look at your shirt to decide. Would you stand up if you have on a yellow shirt. I'm not picking on you, just whoever has on a yellow shirt stand up.
> All right, if you have, happen to have on a green shirt or you have green in it would you stand up. I know this seems unusual, but bear with me. Thank you. You can, you can be seated. If you have on a blue shirt would you stand up? If you have on a blue shirt. You might want to look at your shirt, but if you have on a blue shirt would you stand up? All right, thank you. We'll continue.

(ECF No. 69-8 at 100.) The solicitor subsequently moved to have Juror 342 excused from the jury due to his belief that she was not hearing all the testimony:

> [Solicitor]: . . . . Your Honor, the final thing I would like to bring up is that I would move at this time to excuse Juror 342[.] *I don't think – I think she's following part of the trial testimony. I don't think she's catching all of it.* Your Honor had gone through an exercise to test her hearing ability at one point and she did not stand up when you asked about the blue blouse until the, I think the juror beside her to her left ---
> THE COURT: I, I don't know. I watched that carefully.
> [Solicitor]: --- was trying to help her, nudged her.
> THE COURT: It looked like she was starting to stand up when the juror was

---

[3] *See* S.C. Code Ann. § 16-3-20(B).

nudging. So, it was really hard to gauge. I'll tell you what I will do. I will do another similar test and I know that seemed real odd and I'm glad that you've mentioned it. I did do a test. I have been watching her and I just want to be assured that she's able to hear. I will do it again tomorrow, and hopefully we'll have nobody, hopefully she'll be sitting by someone else and nobody nudging and I'll try that once again. I have been asking about it. I have asked the SLED agents who have been watching, who have been seeing them in the evenings, too, whether she's able to hear and they've indicated that they thought she could, but I have had my concerns and that's the reason that I had that unusual request of the jurors that if you have on a yellow shirt stand or a blue shirt and it was exactly that reason, to test her, and *I am unsure whether she was beginning to stand when she was nudged or whether she was nudged to stand.* I think the appropriate thing to do is try it again, and I certainly note your motion and we'll take it up, remind me tomorrow and we'll take it up again tomorrow depending on the results that we get.

(ECF No. 69-8 at 250–51 (emphasis added).)

The trial judge, prompted by the solicitor, tested the jurors' hearing in a similar

manner the following day, Saturday, October 9, 2004:

[Solicitor]: And, Your Honor, the only other item the State would wish to bring up at this time would pertain to the juror since we're running towards the end of this trial, Juror 342, [] *I still continue to be concerned about her apparent deafness and inability to follow all the testimony.*
THE COURT: All right, and what I said I would do in that regard is that I would call them out and I'm going to have to go through a type of a test as I did yesterday either with the color of their shirt or pants or the color of their hair, something creative to try to see whether she's able to hear because *there have been some things that have brought or cause the Court some concern, times when it looks like maybe she's, she's not watching back and forth and she's not able to hear.*

. . . .

THE COURT: . . . . We're going to do an exercise once again today. So listen very carefully as I ask you these questions. If there are any gentlemen with green shirts on would you stand?
(Complies with request.)
THE COURT: Very good, you may be seated.
(Complies with request.)
THE COURT: You have some green in your shirt. All right, very good.
THE COURT: If we have any ladies who are wearing skirts or dresses would you please stand.

(Complies with request.)

THE COURT: And we do have several and you look very nice I might add. Please be seated.

(Complies with request.)

THE COURT: All right, not to say that the women in the slacks don't look very nice. You do as well. Let me make that clear. All right, now, I think I see some – everyone in blue please stand.

(Complies with request.)

THE COURT: All right, you may be seated.

(Complies with request.)

THE COURT: All right, ladies and gentlemen, I'm going to send you back to the jury room for just a moment. We will have you out in the very near future. You may go back at this time. Do not discuss the case.

(Whereupon, the following takes place outside the presence of the jury.)

THE COURT: Juror Number 342, I need to see – well, first of all let me note on the record that she responded to when I asked about the ladies who were wearing skirts or dresses. She got up for that and she responded to that and it looked like without any nudging or coaxing at all. I was watching for that very carefully. *What she didn't respond to was my next question about blue. She's in a navy blue [sic]. It's dark. She may consider it black, but it's blue. I don't know whether she didn't answer because, and unfortunately she wasn't in a bright blue color, but she didn't answer because she believe[s] she's in black or she didn't answer because she didn't hear me.*

(ECF No. 69-9 at 64–65, 66–68 (emphasis added).) After further discussion with counsel, it was agreed that the trial judge would attempt to make contact with Juror 342's doctor, or clinic, or wherever she went for medical treatment pertaining to her hearing deficit. (*Id.* at 68.) Petitioner's trial counsel suggested that Juror 342 had failed to respond to the trial judge's direction to stand if wearing blue because she was confused by the fact that, although her garment was blue, it had polka dots on it. (*Id.* at 69.) The trial judge again suggested that it could be because she considered it black, and many people have difficulty differentiating between navy blue and black. (*Id.*) Trial counsel stated, "I'm satisfied with what you did. I just think she was a little confused with the blue and the polka dots." (*Id.* at 70.)

The trial judge then indicated the way forward:

THE COURT: It's so important. It's so important for both the State and the Defendant that she's heard everything.

[Trial Counsel]: I understand.

THE COURT: We'll simply inquire who her doctor is and then I'm going to ask her, too has she heard all of the evidence and testimony. *It's kind of hard to know if you've missed something. She's heard what she's heard.*

[Trial Counsel]: Right.

THE COURT: But I'll just ask her if there is [sic] any times that maybe she's turned away and she's missed some of the evidence and testimony. That's all I know to do.

[Solicitor]: *Your Honor, I don't think there's any way to establish with absolute certainty how much she's hearing, and I would suggest just* ---

THE COURT: We'll do both.

[Solicitor]: --- *that all that's gone on, that just out of an abundance of caution we've got two alternates that are here.* Nobody's indicated any sickness or injury or any reason we would need to use those alternates for somebody else. That's why they're here, and ---

THE COURT: If she has heard everything and she doesn't have a hearing problem I just – I don't want to take her off.

(*Id.* at 70–71 (emphasis added).) Whereupon, Juror 342 was summoned back into the courtroom on her own and the trial judge engaged in the following colloquy:

THE COURT: Ma'am, first of all let me tell you[,] you have done nothing wrong. I simply want to ask you some questions and it is about your hearing because we had addressed that somewhat in your individual voir dire and you said that you had some hearing problems. Have you had any difficulty in hearing what has happened – let me ask it this way have you turned away and then found yourself just catching the end of some testimony or not hearing all of it?

[Juror 342]: *Yes, ma'am.*

THE COURT: You have?

[Juror 342]: *Yes, ma'am.*

THE COURT: So, you have missed some of the evidence and testimony?

[Juror 342]: *No, ma'am, I heard it, but it's more like when I – after I heard the testimony I turned my head, you know, concentrate on it.*

THE COURT: Okay, now, listen carefully to this question. Have you found yourself maybe turning away and looking and missing part of a question or part of an answer because you didn't, you didn't turn your head fast enough?

[Juror 342]: *Yes, ma'am.*

(*Id.* at 72 (emphasis added).) The trial judge then asked if the parties had any further questions, and after being prompted by the defense, asked Juror 342 if she considered

her dress to be blue—Juror 342 stated, "Yes, ma'am." (*Id.* at 72–73.) After a bench

conference, the trial judge proceeded with the following:

> THE COURT: Here's something that I – let me, let me ask you, you have been through one phase of this trial and that is the guilt phase of this trial. Now, did you hear all of the evidence and testimony in that phase?
> [Juror 342]: Yes, ma'am.
> THE COURT: Did you ever catch yourself missing part of a question or an answer in that phase of the trial?
> [Juror 342]: Just at one point I thought I missed a little of it but I didn't. I thought about it and I haven't missed it.
> THE COURT: So, you didn't miss anything?
> [Juror 342]: No, ma'am.
> THE COURT: All right, all right, now, at this point is this, is this the phase where you've found yourself turned away and have missed some when we started this part?
> [Juror 342]: No, ma'am.
> THE COURT: *Okay, have you, in fact, turned away and missed some evidence and testimony at this, at this point?*
> [Juror 342]: *I may have missed a little of it but I didn't miss everything.*
> THE COURT: *Okay, all right, so, so, you did miss some at this phase?*
> [Juror 342]: *Yes, ma'am.*
> THE COURT: Do you believe that you missed any at the guilt phase?
> [Juror 342]: No, ma'am.
> THE COURT: Did you find yourself in that same situation where you had turned away and then you've missed some of the question being asked or some of the answer?
> [Juror 342]: *Yes, ma'am, I may have missed concentrating, you know, just steady, may have missed some of it, yes, ma'am.*
> THE COURT: You may have missed some testimony at the guilt phase? Is that what you're saying?
> [Juror 342]: *Yes, ma'am.*

(*Id.* at 73–74.)

In light of these questions and answers, the solicitor renewed his motion to excuse

Juror 342, arguing:

> [Solicitor]: . . . . She's admitted to that may have missed evidence at the guilt and the penalty phase and *she knows she's got a blue dress on, didn't stand up when Your Honor asked her that, and I think clearly she's, she's not catching everything and should be removed.*
> THE COURT: All right.
> [Trial Counsel]: Your Honor, I think if you brought every juror out they would

say that at one point in time they've missed something. I mean, that's – I bet you almost every juror would say, "Yeah, at one point I did miss a little something." We're sitting in this courtroom all day long, so.

(*Id.* at 74–75 (emphasis added).) After some argument back and forth between trial counsel and the solicitor regarding whether Juror 342 failed to stand during the test because she was confused, or because she did not hear the question, the trial judge recalled Juror 342 and the following exchange transpired:

THE COURT: Ma'am, when I was asking the jurors, when I was asking you all to stand up if you had on a green shirt or stand up if you had a dress on and you stood when I asked you if you had – to stand up if you had a dress on. I also asked for everyone who had on blue to stand. *Did you hear that question?*
[Juror 342]: *Yes, ma'am.*
THE COURT: *You heard it? Why didn't you stand?*
[Juror 342]: **You said – asking me did I hear it? Oh, no ma'am.**
THE COURT: *You didn't hear when I asked if you have on ---*
[Juror 342]: **No, ma'am.**
THE COURT: *--- blue stand?*
[Juror 342]: **No, ma'am.**
THE COURT: *Okay, and you were looking directly at me and I was talking ---*
[Juror 342]: **That's why I was trying, I was trying to read your lips when you was like talking.**

(*Id.* at 76–77 (emphasis added).)

Next, the trial judge attempted to retrieve contact information from Juror 342 for her ear, nose, and throat doctor, to see if he could shed light on the extent of her hearing impairment. (*Id.* at 77–78.) The trial judge excused Juror 342 to look for the information and stated the following on the record:

THE COURT: Okay, I'm going to note there's no question. *She has indicated she just flat did not hear and I was looking directly at her and talking and even now she's having difficulty hearing me and I'm raising my voice and there's been a lot quieter voices than mine during the trial of this matter.*

(*Id.* at 78.) After retrieving the contact information from Juror 342, the trial judge called

counsel back into her chambers and made efforts to reach the doctor, which efforts were

unsuccessful. (*Id.* at 79) Upon returning from the recess, the trial judge itemized these

efforts for the record and then stated:

> THE COURT: . . . . There has been some conversation in chambers though about [Juror 342] and her ability to hear. There's been some indication from both the State and from the Defendant that a belief that all of the jurors can be somewhat distracted at some time and no indication that she has not been able to hear the testimony. The indication has been, in fact, that she has been hearing most and has turned away and only missed bits, but she has admitted to missing some.

(*Id.*) The solicitor then abruptly withdrew his motion to excuse Juror 342, stating:

> [Solicitor]: Your Honor, although I did on behalf of the State express some concern about [Juror 342's] hearing problems, the potential problems, in reflecting on this, you know, I started thinking about it and I don't think any, any juror is going to have the capability of getting a hundred percent of the testimony. You're going to have a mix of people that are young and old, some more intelligent than others. Some might have attention deficit problems, and I would note that even a blind juror is qualified to serve in this state, and they obviously are not going to be able to get the same read from a, from a witness that the other jurors could. So, I don't think a hundred percent ability to be, you know, healthy and a hundred percent alert is a qualification per se to serve as a juror. I think [Juror 342] is qualified. She's heard most of what was going on. It would be better if she could hear more, but again, I mean, I think she meets the statutory qualifications as a juror in your discretion. Your Honor, you have qualified her as a juror, and I'm satisfied at this point that she is able to follow the testimony, was able to properly deliberate and would withdraw my motion to have her excused as an alternate.
> THE COURT: All right, anything from the Defense?
> [Trial Counsel]: Yes, Your Honor, I agree one hundred percent with [the solicitor] and I also went over all of the ramifications one way or the other with my client and he is perfectly satisfied that she stays on the jury.

(*Id.* at 80–81.) The trial judge then confirmed, through a series of questions, that trial

counsel and the defendant, himself, were both satisfied with Juror 342 having served in

the guilt phase and continuing to serve in the penalty phase. (*Id.* at 81.) Whereupon, the

defense called its last mitigation witness (*id.* at 85–108) and the sentencing phase

proceeded to its conclusion (*id.* at 183). Jury deliberations began at 3:54 p.m., and a verdict was reached at 5:17 p.m. (*Id.* at 186, 188.) All jurors confirmed that their verdict was accurately represented and Petitioner was sentenced to death. (*Id.* at 189–92, 194–95.)

### 2. PCR Proceedings Regarding Juror 342

Petitioner's PCR counsel called Juror 342's husband ("Mr. Jones") as a witness during the PCR evidentiary hearing. Mr. Jones testified that he had been married to Juror 342 for thirty years and that she had been experiencing hearing problems since 1984. (ECF No. 69-12 at 37–38.) He stated that when he and his wife go to church she likes to sit in the back, but the preacher tells her that she cannot hear and directs her to come to the front. (*Id.* at 38.) Mr. Jones further stated, "And then he would ask her to read and she still couldn't hear what he was saying. Till I say, he asking you to read. Then she would stand up and read."[4] (*Id.*)

Mr. Jones gave some examples of Juror 342's difficulty hearing in commonplace situations: "Well, we'll be out in the yard and I'll say, hand me that rake right over there and she'll be about as far as you to me and she don't hear a thing I say. She keep walking." (*Id.* at 39.) When asked whether she would keep walking because she does not want to hear what Mr. Jones is saying, he responded:

> A: Well, she trying to hear what I say but she don't understand it. She just keep walking. And then I guess we're in the kitchen and I – she said, I need so and so. I said you need this frying pan or something or this skillet, she keep walking just like she ain't hear me. We're right in the kitchen together.
> Q: You can be just a few feet apart?
> A: That's right.
> Q: Okay. Now also you talked about sometimes that she'll be leaving to go somewhere and she'll – and she say like, honey, I'm going, or something

---

[4] Mr. Jones' testimony is transcribed here as it is shown in the PCR transcript, without modification to existing grammatical errors.

like that. Tell the judge about that.
A: Well, a lot of times she get ready to go somewhere and she'll come back and say, I'm fixing to go. I said, well, I heard you, I told you okay. Then she'll come back again and say the same thing again. She didn't hear what I said to start with.
Q: She didn't hear you acknowledge her?
A: That's right.

(*Id.* at 39–40.)

Mr. Jones testified that Juror 342 is sensitive about her hearing problem, and that "[s]he get furious" when she is told she needs a hearing aid. (*Id.* at 38, 40.) He explained that "she gets mad" because "she don't want to be deaf, she don't want no hearing aid neither." (*Id.* at 40–41.)

Trial counsel also testified to their recollection of the questions surrounding Juror 342's hearing impairment during the trial. Assistant trial counsel, who focused his advocacy on the sentencing phase (*see* ECF No. 69-11 at 260–61), testified that when Juror 342's hearing problems were being discussed, "[he] felt a mistrial might be a good idea." (*Id.* at 250.) When asked whether the trial judged offered to grant a mistrial based on Juror 342's hearing difficulties, assistant trial counsel stated, "I think she did. I do not specifically remember her stating those words, but my recollection is that if we were to ask for it, she would grant it." (*Id.* at 254.) Assistant trial counsel also described his memory of the conversation that occurred in the trial judge's chambers:

. . . [lead trial counsel] was teasing, was joking around with [the trial judge], and he said at some point in the future she would be on the Court of Appeals and he would be retired. I also remember since then in chambers the judge trying to telephone a doctor, and that's also when I recollect some language, although I don't specifically remember hearing her say it, but some language about the mistrial.

(*Id.* at 255.) When asked whether he discussed the trial judge's concerns about Juror 342's hearing and the prospect of asking for a mistrial with lead trial counsel, assistant

trial counsel stated:

> A: I don't specifically recall any conversations with [lead trial counsel]. I'm sure there probably was some.
> Q: But you can't recall?
> A: No, I left – I left that up to him.
> Q: There was no doubt in your mind that this juror had hearing problems, right?
> A: She had a hearing problem, yes.

(*Id.* at 257.) Assistant trial counsel later reaffirmed that lead trial counsel was primarily handling the Juror 342 issue, and he deferred to lead trial counsel on whether or not to seek a mistrial. (*See* ECF No. 69-12 at 18–19.)

Lead trial counsel testified that the trial judge noticed Juror 342's hearing problem first and called it to the parties' attention, but that "we all noticed it." (*Id.* at 49.) He stated that once Juror 342 indicated she relied upon lip reading as a way to try to understand what somebody was saying, he thought the trial judge should have removed her from the jury. (*Id.*) Trial counsel further testified that, after the trial, he thought more about Juror 342's hearing impairment and wondered how she could have effectively participated in deliberations, given the context of group discussion around a table. (*Id.* at 49–50.) Based on counsel's conversations with the trial judge, and in light of the judge's persistent questioning of Juror 342, trial counsel believed the judge was going to order a mistrial and he was surprised when she did not. (*Id.* at 50–51.)

On cross-examination, trial counsel testified that he should have made a motion for mistrial and that "there's no doubt [Juror 342] did not belong on that jury." (*Id.* at 90.) He asserted that the trial judge told the defense that she would grant a mistrial if they requested one. (*Id.* at 91.) When pressed to explain why he affirmatively argued to retain Juror 342 if he was offered a mistrial, trial counsel admitted that Juror 342's race, as the

only black juror, played a role: "I'm saying the reason was is [sic] because if that were a white woman there's no doubt I probably would have – I would have done it differently, but at least we got one black on the jury." (*Id.* at 97.) Trial counsel further stated, "in hindsight," that no one had appropriately considered how Juror 342's hearing difficulties would impair her ability to deliberate, but had it "dawned on [him]," he would have brought it to the trial judge's attention. (*Id.*)

The solicitor also testified at the PCR evidentiary hearing regarding his recollection of Juror 342's hearing impairment at trial. When asked whether the trial judge discussed a mistrial, the solicitor stated:

> A: Well, it was an ongoing thing that led up to that with the – this person's hearing loss and the judge and the attorneys tried to ascertain the extent of the hearing loss and what impact that might have had on [sic] ability to be a juror. And at some – at some point the issue did come [sic] if she did decide – by then we were in the penalty phase.
> Q: Right.
> A: The issue came up if the judge decided that juror was not qualified at that point in time the penalty phase, then what will that do to the verdict.
> Q: Right.
> A: Yeah, that did come up.
> Q: And did you ever hear [the trial judge] just flatly say to the defense or to you that if you requested mistrial I'll give it?
> A: I don't recall that at all.

(*Id.* at 111–12.) The solicitor asserted that talk of a mistrial was just "something that was in the air" and "came up in the discussion," though he did not recall who brought up the topic. (*Id.*) He became concerned that if Juror 342 was excused and replaced with an alternate for the sentencing phase, it would potentially expose the guilt phase to an argument on appeal that there should have been a mistrial rather than using an alternate juror. (*Id.*) In explaining why he changed positions from repeatedly moving for Juror 342's excusal, to arguing in agreement with the defense that she should be retained, the

solicitor stated:

> I was trying to protect the record. I was also concerned about the fact that . . . the defendant was a black male. The juror was a black female. There are mostly white jurors on there, and that if she was removed and replaced with a white alternate it could create . . . a *Batson*-type issue.

(*Id.* at 112–13.)

The solicitor testified that, although Juror 342 had disclosed her hearing issue on her questionnaire, and "everyone knew that she did have the hearing loss," it was "hard to get a grasp on how bad it was or how large one [sic] it may have been. It was difficult to determine because she kept insisting she was able to hear and follow the testimony, but then she would admit that she did miss out on certain things." (*Id.* at 113.) Regarding his abandoned request to excuse Juror 342, the solicitor stated, "I think everybody recognized that you don't have to be a perfect specimen to be on a jury. You can be blind. You can have other impediments. And we never crossed to that point where anybody decided that she was not qualified . . . ." (*Id.* at 113–14.) On cross-examination, the solicitor testified that he "went back and forth" with his concerns about Juror 342, explaining that his concerns were alleviated when she told the trial court she could hear everything, "then there would be maybe another test or another indication that she wasn't hearing well and I would begin to wonder." (*Id.* at 117–18.) Finally, the solicitor agreed that he changed his mind about seeking her removal from the jury after the meeting in the trial judge's chambers, wherein the judge was attempting to contact Juror 342's doctor. (*Id.* at 118.)

### 3. The Unreasonableness of the PCR Court's Factual Findings

The PCR Court made the following findings in denying Petitioner's due process

claim[5] regarding Juror 342:

> This Court finds that Juror [342] was qualified to serve on the jury without objection. Juror [342] testified she heard all testimony during the guilty phase and was able to compensate for her hearing deficiencies. The trial court also took specific measures to ensure that Juror [342] was able to hear testimony. Additionally, South Carolina Courts have held that a person who has difficulty hearing is not per se disqualified from serving as a juror. *Safran v. Meyer*, 103 S.C. 356, 364, 88 S.E. 3, 4 (1916).
>
> This Court finds there was not a sufficient showing that [Juror 342] missed material testimony at trial or that her hearing difficulty was of such degree as to indicate she missed material. [sic] Therefore, this due process claim is denied.

(ECF No. 69-15 at 47.) The Court now finds that the PCR Court's factual findings were unreasonable, and that Petitioner has shown as much by clear and convincing evidence.

First, the Court is mindful that it is not at liberty to supplant the factual findings of State tribunals merely because its subjective reading of trial transcripts would lead it to draw different conclusions than the State courts. *See Marshall v. Lonberger*, 459 U.S. 422, 434 (1983) ("28 U.S.C. § 2254(d) gives federal habeas courts no license to redetermine credibility of witnesses whose demeanor has been observed by the state trial court, but not by them."); *see also* 28 U.S.C. § 2254(e)(1) ("[A] determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."). Second, the Court is well aware of the established principle that the trial judge is in the best position to evaluate whether a juror is qualified for service. *See United States v. Fulks*, 454 F.3d 410, 430 (4th Cir. 2006) ("The trial court—which unlike us was in the

---

[5] In his PCR action, Petitioner styled this claim as seeking relief for denial of his rights to due process under the Fifth Amendment, and to a competent jury under the Sixth Amendment. (*See* ECF No. 69-15 at 47.) The substance of the claim is the same in the instant case, even though Petitioner no longer specifically invokes the Due Process Clause of the Fifth Amendment in the way he styles the claim here. (*See* ECF No. 65 at 7.)

best position to view [the juror's] demeanor and assess her credibility—was convinced that she would carefully weigh all the evidence. That finding, given [the juror's] answers on voir dire, is entitled to deference."). Nonetheless, even affording the trial judge and the PCR Court all the appropriate deference, the undersigned concludes that their finding Juror 342 competent for continued jury service in light of her incapacitating hearing impairment was "'sufficiently against the weight of the evidence that it [was] objectively unreasonable.'" *Williams v. Stirling*, 914 F.3d 302, 312 (4th Cir. 2019), *as amended* (Feb. 5, 2019) (quoting *Winston v. Kelly*, 592 F.3d 535, 554 (4th Cir. 2010)). Specifically, it was unreasonable for the PCR Court to find that Juror 342 was qualified to serve on the jury, that she heard all testimony during the guilt phase, and that there had not been a sufficient showing that her hearing difficulty was of such degree as to cause her to miss material testimony. (*See* ECF No. 69-15 at 47.)

To begin with, the Court would note that the State's proof of Petitioner's guilt was ironclad. Trial counsel testified at the PCR hearing that there was "never a question of [Petitioner's] guilt," and that "it never entered [his] mind that [the jury] would find him not guilty." (ECF No. 69-12 at 64, 78.) Assistant trial counsel testified that he "strongly, strongly believe[d]" that the result would be the same "if you tr[ied] that guilt phase a thousand times," and "I feel as strong as I could that it would turn out the same every time." (ECF No. 69-11 at 237.) In the instant proceeding, Respondents stated in their summary judgment brief, "The guilt phase evidence was absolutely overwhelming . . . ." (ECF No. 72 at 59. *See id.* at 12–16 (summarizing the State's guilt-phase evidence).) Petitioner likewise conceded in his response brief, "the State's evidence against Mr. Bryant was virtually impenetrable. Mr. Bryant's trial counsel were aware of this, and were

also aware that when they reached the sentencing phase, they would be arguing that the crime was an aberration for Mr. Bryant, and that he was remorseful." (EFC No. 78 at 17 (internal citation omitted).) Accordingly, the Court finds that the constitutional error present in the record was harmless as to Petitioner's convictions for murder and armed robbery, and those convictions will not be displaced by the instant ruling.

It is perfectly clear from the record that the trial judge had concerns about Juror 342's ability to hear *throughout the trial*. This is demonstrated by the fact that she spontaneously began questioning the jury, and specifically Juror 342, about hearing difficulties after seven of the State's twenty-eight fact witnesses had testified. (*See* ECF No. 69-5 at 2–3, 86–87.) It is also clear that Juror 342 failed to advise the trial court, the solicitor, or Petitioner's trial counsel that she needed to read lips in order to assist her with understanding testimony. This was material information regarding her capacity as a juror, which was only haphazardly discovered as a result of the trial judge's *sua sponte* questioning, *well after the parties and the trial court deemed her a qualified juror*, and after—by the trial judge's description—"plenty of times" when witnesses on the stand and/or examining counsel turned away from the jury box. (*See id.* at 87.)

Furthermore, even though the trial judge gave the jury specific instructions, including a particular hand signal, about what to do if they were having trouble hearing, there is no indication that Juror 342 ever once availed herself of this hand signal, even though she admitted trouble hearing numerous times in response to *judge-initiated* questioning. (ECF No. 69-4 at 183–84; 69-5 at 86–87; 69-9 at 72–74.) In other words, whether due to embarrassment or oversight, it seems Juror 342 was either unwilling or incapable of *volunteering* the undisputed truth that she was having difficulty hearing. The

trial judge and solicitor relied upon their own observations—represented both implicitly and explicitly in the record—of Juror 342 to begin an inquiry into her actual ability to hear the testimony. The upshot of this is that her hearing difficulties were *externally evident*. Whatever demeanor and body language the trial judge and solicitor observed that led them to initiate such an inquiry surely went beyond the typical distraction or temporary lack of focus that every juror suffers from time to time.

In making his first motion for Juror 342 to be removed from the jury, the solicitor stated:

> I don't think – I think she's following part of the trial testimony. I don't think she's catching all of it. Your Honor had gone through an exercise to test her hearing ability at one point and she did not stand up when you asked about the blue blouse until the . . . juror beside her to her left . . . nudged her.

(ECF No. 69-8 at 250.) The trial judge noted the solicitor's oral motion, indicated that she was "unsure whether [Juror 342] was beginning to stand when she was nudged or whether she was nudged to stand," and stated that "the appropriate thing to do is try it again." (*Id.* at 251.) The following day, the solicitor prompted the trial judge to conduct another hearing test, stating, "I still continue to be concerned about her *apparent deafness and inability to follow all the testimony*;" the trial judge agreed, stating, "there have been some things that have brought or cause the Court some concern, *times when it looks like maybe she's, she's not watching back and forth and she's not able to hear*." (ECF No. 69-9 at 64–65 (emphasis added).)

After Juror 342 failed the second hearing test, the trial judge observed the limitations of simply continuing to ask her whether she had heard all the testimony, "It's kind of hard to know if you've missed something. She's heard what she's heard;" the solicitor agreed and continued to push for Juror 342 to be removed, "I don't think there's

any way to establish with absolute certainty how much she's hearing, and I would suggest just . . . that all that's gone on, that just out of an abundance of caution we've got two alternates that are here." (*Id.* at 70–71.)

When individually questioned by the trial judge as to whether she had missed testimony, Juror 342 gave contradictory answers—saying both "yes" that she missed some, and "no" she had not missed any—concerning both the guilt phase and the penalty phase. (*See* ECF No. 69-9 at 72–74.) But the final straw was when Juror 342 admitted to having failed to hear the trial judge's instruction to stand if wearing blue ***in the middle of the trial judge's second makeshift hearing test***. (*See id.* at 76–77.) And this in the context of the trial judge and the solicitor's suspicion that Juror 342's compliance with the first hearing test may have simply been the result of an assisting nudge from an adjacent juror. (*See* ECF No. 69-8 at 100, 250–51.)

It is unclear what further indication of Juror 342's hearing incapacity the trial judge was waiting for in order to find her unqualified for continued service on the jury. It is further unclear what more transparent, albeit unwitting, admission of her hearing deficit Juror 342 could have given. If there was any moment when Juror 342 would have been focused on understanding the specific words being spoken in the courtroom, it would be when the trial judge was addressing the jury directly (eliminating the added complexity of bouncing back and forth between examining counsel and the witness stand), and plainly instructing cohorts of Juror 342's peers to stand in succession based on various criteria. Moreover, Juror 342 admitted she was "trying to read [the trial judge's] lips" at that specific moment, demonstrating that the accommodation which was supposed to have been mitigating her hearing deficiency all along *was not reliable*. (*See* ECF No. 69-9 at 76–77.)

The trial judge's repeated questioning of Juror 342 brought *no resolution* about *how much* of the testimony she had missed, as Juror 342 continued to say both that she had heard everything and that she had missed parts, causing the solicitor to renew his motion that Juror 342 be removed: "[S]he knows she's got a blue dress on, didn't stand up when Your Honor asked her that, and I think clearly she's, she's not catching everything and should be removed." (*See id.* at 72–74.) Of course, by its very nature, Juror 342's disability would make it impracticable, if not impossible, for the trial judge to determine what portions of trial Juror 342 missed without simply letting her read a transcript of the proceedings. After recalling Juror 342 to ask her directly *why* she failed to stand during the second hearing test, the trial judge transparently noted, "there's no question. . . . she just flat did not hear and I was looking directly at her and talking and even now she's having difficulty hearing me and I'm raising my voice and there's been a lot quieter voices than mine during the trial of this matter." (*Id.* at 78.)

The undersigned is well aware of the inertia that develops around protecting the integrity of a trial record as more and more time and energy have been expended to reach the latter stages. To put it bluntly, all participants in the retrial of a capital murder case— trial judge and counsel alike—would understandably be reticent to consider the inevitable ramifications of straight-faced acknowledgment that one of the jurors had missed indeterminate portions of testimony . . . a *third* trial. Indeed, the undersigned is mindful of how that same inertia can creep into PCR and federal habeas proceedings, making the relevant standards of review, which are rightly very deferential, functionally impossible to satisfy. But, most especially where the ultimate, irreversible penalty is at stake, the burden and impracticality of beginning again must be ignored for the sake of ensuring that if such

a penalty is imposed, it is done by the unanimous agreement of a fair, impartial, and *competent* jury. It only takes one unconvinced juror to preclude unanimity. Juror 342 was not competent and should have been excused.

The evidence presented at the PCR evidentiary hearing only cemented this fact. Mr. Jones testified that Juror 342's hearing problems began in 1984, twenty years prior to Petitioner's trial, and that she routinely misses things spoken directly to her in various commonplace situations, including when he addresses her from just a few feet away. (ECF No. 69-12 at 37–40.) Furthermore, Mr. Jones indicated that Juror 342 is sensitive about her hearing impairment, to the point of getting "mad" and "furious" when told she needs a hearing aid, because "she don't want to be deaf." (Id. at 40–41.) Mr. Jones' testimony both elucidated the profound nature of Juror 342's hearing loss, and offered a coherent explanation for why Juror 342 never once volunteered that she was having trouble hearing during the trial, though her struggles were observable to the trial judge and counsel.

The solicitor's PCR testimony revealed that he withdrew his repeated motion to excuse Juror 342 not because his belief that she was missing trial evidence changed, but because he was concerned with the practical ends of insulating the record against appellate review and avoiding a "*Batson*-type issue" that could be created by removing the only black juror on the panel. (ECF No. 69-12 at 112–13.)

Finally, trial counsel's PCR testimony invoked the vital, but unanswered, question of how Juror 342 could effectively participate in deliberations if she relied on lip reading with, apparently, limited success. (*See id.* 49–50, 97.) Given the realities of a mid-sized group seated around a conference table, jurors potentially speaking over each other when

debating aspects of the case, and Juror 342's timidity and sensitivity about her hearing difficulties, this was a valid concern.

Therefore, the Court holds that, in light of the evidence presented in the State court proceedings, it was not just incorrect or erroneous, but unreasonable for the PCR Court (1) to find that Juror 342 was appropriately qualified by the trial court, (2) to credit Juror 342's statements that she "heard all testimony" (ECF No. 69-15 at 47) during the guilt phase without accounting for her statements to the contrary about both the guilt and penalty phases, and (3) to find that Petitioner had not made a sufficient showing that Juror 342's hearing impairment was of a degree to materially impair her ability to receive and consider evidence. *See Williams*, 914 F.3d at 312.

### 4. The PCR Court's Unreasonable Application of Federal Law

Every criminal defendant is entitled to a jury that is both impartial and competent to adjudicate his case. *Tanner v. United States*, 483 U.S. 107, 126 (1987). *See Peters v. Kiff*, 407 U.S. 493, 501 (1972) ("Long before this Court held that the Constitution imposes the requirement of jury trial on the States, it was well established that the Due Process Clause protects a defendant from jurors who are actually incapable of rendering an impartial verdict, based on the evidence and the law."); *Jordan v. Massachusetts*, 225 U.S. 167, 176 ("Due process implies a tribunal both impartial and mentally competent to afford a hearing."). The right to a competent jury necessarily implies that jurors are free from physical infirmities that would interfere with, or prevent, their ability to properly receive and consider evidence.

The trial judge found Juror 342 to be qualified, which, according to State law, meant that she determined that Juror 342 was not "incapable by reason of mental or physical

infirmities to render efficient jury service." *See* S.C. Code Ann. § 14-7-810(3). The PCR Court ratified this finding, noting that Juror 342 was qualified to serve on the jury without objection and that difficulty hearing is not a *per se* disqualification under South Carolina law. (ECF No. 69-15 at 47 (citing *Safran v. Meyer*, 88 S.E. 3, 4 (S.C. 1916)[6]).)

In the Report, the Magistrate Judge stated that "the attorneys on both sides likened the effect of Juror 342's hearing impairment to that of a juror who was momentarily distracted." (ECF No. 86 at 44.) Here, the Magistrate Judge was referring to the parties' arguments, transcribed above, to retain Juror 342 after returning from a conference in the trial judge's chambers. (*See* ECF No. 69-9 at 80–81.) The Magistrate Judge further stated, "Petitioner has failed to present, and the undersigned has not found, a United States Supreme Court case indicating that a due process violation occurs when a juror is seated who 'missed bits' of testimony or who had a hearing impairment to that of Juror 342." (ECF No. 86 at 44 (citing ECF No. 69-9 at 79).) The Report proceeds with an analysis of case law indicating that a defendant's due process rights are not necessarily violated when a juror misses testimony due to inattention or sleep. (ECF No. 86 at 44– 46); *see, e.g.*, *United States v. Johnson*, 409 F. App'x. 688, 692 (4th Cir. 2011) (declining to find error by a district court that failed to remove an allegedly sleeping juror, where the record only showed that the juror was tired and perhaps inattentive for an undefined period of time during the defense's opening statement and informant's direct testimony).[7]

---

[6] The Court notes that the relevant appellate issues in *Safran*, a 100-year-old decision, were whether the trial court erred by not granting a new trial on the ground that one of the jurors was "defective in hearing," and whether the trial court erred in not having the juror brought into open court for examination regarding his hearing. 88 S.E. 3, 4 (S.C. 1916). The South Carolina Supreme Court held that hardness of hearing does not *per se* disqualify a juror from service. *Id.* The opinion includes no details about the extent of the hearing impairment in question, and the trial judge made no specific findings in that regard. *See id.*

[7] In *Johnson*, the Fourth Circuit favorably cited the Seventh Circuit's standard for addressing the issue of sleeping or dozing jurors:

However, the Court finds that the circumstances invoked by Juror 342's hearing deficit are distinguishable from a sleeping juror scenario because an inattentive juror can be roused to wakefulness, whereas Juror 342's hearing impairment affected her ability to absorb and assess testimony throughout the trial and deliberations. No reasonable fact finder could conclude that Juror 342's hearing deficit was inconsequential when she plainly could not hear questions posed to her that were designed to test her hearing, when she admitted to missing testimony in both the guilt and penalty phases, and when her proposed accommodation—lip reading—proved unreliable. *But see*, *United States v. Dempsey*, 830 F.2d 1084, 1087–89 (10th Cir. 1987) (upholding the service of deaf juror, who was aided during trial and deliberations by a sign-language interpreter, and who was chosen as jury foreperson; noting, "[m]any jurors have somewhat less than perfect hearing or vision, or have other limitations on their abilities to assimilate or evaluate testimony and evidence")

The Court recognizes that there is, indeed, no Supreme Court precedent expressly dictating that a juror with substantially the same hearing deficit as Juror 342 is constitutionally disqualified from jury service, however:

> AEDPA does not "require state and federal courts to wait for some nearly identical factual pattern before a legal rule must be applied." *Carey v. Musladin*, 549 U.S. 70, 81, 127 S. Ct. 649, 656, 166 L.Ed.2d 482 (2006) (KENNEDY, J., concurring in judgment). Nor does AEDPA prohibit a federal

---

If sleep by a juror makes it impossible for that juror to perform his or her duties or would otherwise deny the defendant a fair trial, the sleeping juror should be removed from the jury. *See United States v. Kimberlin*, 805 F.2d 210, 244 (7th Cir. 1986); *United States v. Bradley*, 173 F.3d 225, 230 (3d Cir. 1999); *United States v. Springfield*, 829 F.2d 860, 864 (9th Cir. 1987). However, a court is not invariably required to remove sleeping jurors, *Springfield*, 829 F.2d at 864, and a court has considerable discretion in deciding how to handle a sleeping juror, *United States v. Wilcox*, 50 F.3d 600, 603 (8th Cir. 1995). Reversal is appropriate only if the defendant was deprived of his Fifth Amendment due process rights or his Sixth Amendment right to an impartial jury. *Springfield*, 829 F.2d at 864.

*United States v. Freitag*, 230 F.3d 1019, 1023 (7th Cir. 2000). In any event, it is clear that a court's responsibility to remove a juror in order to protect a defendant's due process rights and right to an impartial jury turns on the specific circumstances in question.

> court from finding an application of a principle unreasonable when it
> involves a set of facts "different from those of the case in which the principle
> was announced." *Lockyer v. Andrade*, 538 U.S. 63, 76, 123 S. Ct. 1166,
> 155 L.Ed.2d 144 (2003). The statute recognizes, to the contrary, that even
> a general standard may be applied in an unreasonable manner. *See, e.g.*,
> *Williams v. Taylor*, 529 U.S. 362, 120 S. Ct. 1495, 146 L.Ed.2d 389 (finding
> a state-court decision both contrary to and involving an unreasonable
> application of the standard set forth in *Strickland v. Washington*, 466 U.S.
> 668, 104 S. Ct. 2052, 80 L.Ed.2d 674 (1984)).

*Panetti v. Quarterman*, 551 U.S. 930, 953 (2007). The general standard at issue in Ground One is Petitioner's bedrock constitutional right to a competent jury, a jury composed of individuals free from physical infirmities that would render them substantially incapable of assimilating and evaluating witness testimony. The Court finds that the PCR Court unreasonably applied this general standard by glossing over the full import of Juror 342's equivocation regarding her ability to hear, the elucidating PCR testimony that exposed the profundity of her hearing impairment, and the unreliability of her proposed accommodation—lip reading—which was not revealed during voir dire and only haphazardly discovered part way through the guilt-phase evidence. Accordingly, Petitioner's objections regarding Ground One are sustained, the Report is rejected as to Ground One, and the amended habeas petition is granted as to Ground One.

## B. <u>Ground Two</u>

In Ground Two, Petitioner alleges he was denied the effective assistance of counsel as guaranteed by the Sixth Amendment when trial counsel failed to insist on the removal of Juror 342 in light of her hearing impairment. (ECF No. 65 at 9.) Petitioner focuses this claim on the assertion that his trial counsel improperly and unreasonably kept Juror 342 on the jury solely because she was black. (*See* ECF No. 78 at 12–16.)

With regard to this claim, the PCR Court stated:

Counsel's decision not to request Juror [342] excused [sic] was a strategic decision. Counsel explained that he did not excuse Juror [342] because he did not like the alternate jurors who would replace Juror [342]. Counsel also stated he did not approve of the selection process because it was conducted as a paper strike. Overall, Applicant failed to show counsel's reasons for keeping Juror [342] was [sic] not a valid strategic reason.

This court finds that the Applicant has failed to establish that trial counsel was ineffective in not requesting that Juror [342] be removed during either the guilt or innocence phase of this trial.

(ECF No. 69-15 at 49.) Petitioner argues that the decision not to seek Juror 342's excusal cannot be properly categorized as a valid "strategic decision," because "[a] finding that [trial counsel's] race-based rationale was reasonable would be in direct conflict with Supreme Court jurisprudence, which has repudiated the racial stereotype that guided trial counsel's decision-making." (ECF No. 78 at 15.)

The Magistrate Judge concluded that there is support in the record for the PCR Court's factual findings on this *Strickland* claim (*see* ECF No. 86 at 50–51), and that Petitioner's arguments regarding the PCR Court's unreasonable application of federal law rely on an overextension of Supreme Court precedent (*see id.* at 52–54).

Petitioner objects by arguing that the Magistrate Judge's conclusion regarding the PCR Court's factual findings does not square with trial counsel's PCR testimony or the record as a whole. (ECF No. 89 at 3.) Petitioner contends that a fair reading of the record shows that trial counsel kept a functionally deaf juror on Petitioner's capital jury solely because she was black. (*Id.*) The Magistrate Judge noted that some of trial counsel's statements arguably imply that Juror 342's race was his only consideration in deciding not to seek Juror 342's removal (*see* ECF No. 86 at 51 (citing ECF No. 69-12 at 97 ("[I]f that were a white woman there's no doubt I probably would have—I would have done it differently, but at least we got one black on the jury.")))), but opined that trial counsel's

PCR testimony, when considered as a whole, reflects that other considerations also factored into his decision (*see* ECF No. 86 at 50–51 (citing ECF No. 69-12 at 90 (stating, "I don't think we particularly cared for the alternate"), 93–95 (explaining, in response to the question why trial counsel argued to keep Juror 342 on the jury after having been offered a mistrial[8] by the trial judge, "Well, again, we were a little angry about the way the jury was picked"[9]))). The Court agrees with Petitioner's objections on this issue and, as further explained below, finds that the PCR Court's factual findings were unreasonable in light of the record.

Petitioner further objects to the Magistrate Judge's conclusion that Petitioner failed to demonstrate an unreasonable application of federal law. Petitioner construes the Report as "find[ing] that using race in contexts other than peremptory challenges would survive constitutional scrutiny", and argues that "the great weight of legal authority militates against using race in this manner, in either the criminal or civil law context." (ECF No. 89 at 4 (citing *Buck v. Davis*, 137 S. Ct. 759, 775 (2017) (finding ineffective assistance

---

[8] In his PCR testimony, trial counsel represented that the trial judge said she should would grant a mistrial on the issue of Juror 342's hearing difficulties if the defense requested it. (*See* ECF No. 69-12 at 93.) All discussion of a mistrial happened during conversations off the record (*see id.* at 90–91 (trial counsel stating, "It was just part of a conversation," and referring to counsel joking in the trial judge's chambers about not being involved in the retrial if a mistrial was declared)), as there is no explicit offer of a mistrial in the trial transcript. The solicitor disputed, in his PCR testimony, that the trial judge directly offered a mistrial to either party regarding Juror 342, stating that the concept of a mistrial was just "something that was in the air" and "came up in the discussion." (*Id.* at 111–12.)

[9] Here, trial counsel is referring to the trial court conducting a "paper strike," which did not allow the parties to view the jurors when deciding how to exercise their peremptory strikes. In Ground Three, now expressly abandoned, Petitioner claimed that his right to a fair jury selection process as guaranteed by the Sixth and Fourteenth Amendments was violated by the "paper strike." Trial counsel objected to the paper strike at trial, and the issue was raised on direct appeal. The South Carolina Supreme Court denied relief, stating, "the record shows that Bryant affirmatively chose to forego the physical viewing of jurors and proceed with the paper strike method as part of a strategic move to generate a strike list more beneficial to the defense." *State v. Bryant*, 642 S.E.2d 582, 586–87 (S.C. 2007). The parties had initially agreed to view jurors by calling them forward in the order they were qualified, but trial counsel later requested a redraw. *Id.* at 587. At the PCR hearing, trial counsel explained that the potential jurors the defense wanted were "all in the end pools," and that if he had not sought a redraw, the final jury would already have been selected before the defense's desired jurors were called. (ECF No. 69-12 at 93–94.)

of counsel where defense counsel, during the penalty phase of capital murder trial, presented expert testimony that defendant was statistically more likely to act violently in the future because he was black); *Parents Involved in Community Schools v. Seattle School Dist. No. 1*, 551 US. 701 (2007) (holding the use of racial classifications in school districts' student assignment plans violated the Equal Protection Clause of the Fourteenth Amendment because the school districts had not demonstrated that such classifications were narrowly tailored to achieve a compelling government interest); *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200 (1995) (holding "that all racial classifications, imposed by whatever federal, state, or local governmental actor, must be analyzed by a reviewing court under strict scrutiny," and remanding for consideration whether race-based presumptions in a federal program designed to provide highway contracts to disadvantaged business enterprises could survive such scrutiny); *Johnson v. California*, 543 U.S. 499 (2005) (holding strict scrutiny applied to State department of corrections' unwritten policy of placing new inmates with cellmates of same race)).)

The Magistrate Judge found that Petitioner's reliance on *Batson v. Kentucky*, 476 U.S. 79 (1986), and *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127 (1994),[10] is misplaced because *Batson* and *J.E.B.* both considered the use of peremptory challenges, whereas the juror question at issue here dealt with the decision to retain or excuse a juror who had already been qualified by the trial court and participated in trial proceedings through and including the guilty verdict. (*See* ECF No. 86 at 52–53.) The Court agrees with this limited portion of the Report's analysis on Ground Two, and notes that the cases cited in Petitioner's objections are not directly relevant to the reasonableness of the PCR Court's

---

[10] Petitioner relied upon *Batson* and *J.E.B.* not in the amended habeas petition itself, but rather in his response to the Respondents' motion for summary judgment. (*See* ECF No. 78 at 14–15.)

construal of federal law.

Petitioner challenges the race-based decision making of his defense counsel, not the State, which distinguishes this case from *Batson* and *J.E.B. See J.E.B.*, 511 U.S. at 128 ("We have recognized that whether the trial is criminal or civil, potential jurors, as well as litigants, have an equal protection right to jury selection procedures that are free from *state-sponsored* group stereotypes rooted in, and reflective of, historical prejudice." (emphasis added, citations omitted)). Additionally, trial counsel's efforts to *retain* a minority juror whose race matched that of his client—as distinct from *excluding* a minority juror based on race—should not be equated with the forms of invidious stereotypes and historical prejudice that *Batson* and *J.E.B.* sought to expel from the judicial process. Nevertheless, as explained *infra*, the Court finds that it was objectively unreasonable for the PCR Court to conclude that trial counsel was not ineffective for arguing that Juror 342 should be retained on the jury, and rejects the Report's contrary recommendation.

### 1. The Unreasonableness of the PCR Court's Factual Findings

The Court first notes that the factual context relevant to the *Strickland* claim presented in Ground Two is inextricably intertwined with the factual context already analyzed with regard to the Sixth Amendment claim presented in Ground One. Accordingly, the Court incorporates here, without repetition, its previous transcription of excerpts from the trial record and PCR proceedings pertaining to Juror 342. (*See supra* at 11–27.) Moreover, the Court observes, once again, that the State's proof of Petitioner's guilt was unassailable, so the constitutional error that the Court finds herein is harmless with respect to Petitioner's convictions, though not with respect to his death sentence.

The PCR Court found that trial counsel made a "strategic decision" not to seek

Juror 342's removal because: (1) he did not like the alternate jurors who would replace Juror [342], and (2) he did not approve of the "paper strike" jury selection process. (ECF No. 69-15 at 49.) But these putative reasons for trial counsel's course of action were cherry-picked out of trial counsel's PCR testimony, and make no sense as justifications to ignore the presence of an incompetent juror on the panel.

The State's PCR counsel cross-examined trial counsel as to why he chose not to seek a mistrial in the following manner:

> Q: Let's talk a little bit about [Juror 342] – and correct me if I'm wrong, but from my understanding your testimony is that [the trial judge] offers [sic] you a mistrial if you'd asked for it based on [Juror 342], but you decided not to, is that correct?
> A: It didn't happen that way. It was just part of a conversation. I was under the impression that she was gonna declare a mistrial, and she kept going back to it and back to it. And every minute I kept thinking I was gonna hear, ["]I don't want to hear anymore this is a mistrial[,"] but she never did. And in retrospect when I read the transcript *there's no doubt that [Juror 342] did not belong on that jury*.
> Q: So that's something you've decided in hindsight as this proceeding has come to this point, is that correct?
> A: Not necessarily. I was busy with other things, but I did weigh into the fact that she was a person of color.
> Q: Okay.
> A: And we would be getting rid of – and I don't think we particularly cared for the alternate, but *I don't think the alternate came into – in the penalty phase she's already voted so that didn't come into it.* It would have to be a mistrial, but I would say that, yes, *I should have made a motion to – for a mistrial, definitely*.

(*Id.* at 89–90 (emphasis added).) When placed in context, the only reasonable reading of trial counsel's PCR testimony reveals: (1) that trial counsel knows he should have sought a mistrial, because Juror 342 "did not belong on that jury;" and (2) that the prospect of an undesirable alternate replacing Juror 342 "didn't come into" the decision not to seek a mistrial, because the discussion surrounding Juror 342's excusal occurred at a stage of trial when her removal for cause would have required a mistrial.

After some questions from the PCR Court about what point in the trial Juror 342's

hearing problem became known, and whether alternate jurors were still available (*see*

ECF No. 69-12 at 90–91), cross-examination continued and trial counsel stated:

> THE WITNESS: . . . . I was under the impression it was a mistrial on everything. [The trial judge] just threw her hands up and said this is a mistrial is the way I recall it. I don't recall her saying, well it'd be just a mistrial on the guilt part or mistrial on – it happened throughout the whole trial. She kept questioning her, can you hear, can you hear. At one point [Juror 342] said, I can't hear, and right away I thought the judge was gonna say mistrial and she never did.
>
> Q: Okay. And just so we're clear though, she never once said to you, you know, [trial counsel], if you request a mistrial I'll give it to you. You just thought that if ---
>
> A: No, she did, she did say that.
>
> Q: She did say that?
>
> A: Oh, yeah.
>
> Q: Okay. Well, let me ask you this then, why did y'all argue so strenuously on the record to keep her on the jury, keep [Juror 342] on the jury, if you had been offered a mistrial?
>
> A: Well, again, we were a little angry about the way the jury was picked. Most of the jurors that we wanted were in the last groups which she refused to put into the hopper 'cause [the solicitor] objected. And that means that somebody – let's assume you have pools of five and let's assume you have ten pools, whatever, you have 150 people, well somebody is on the end pool. They'll never get picked because you'll have a jury already. . . . And it just so happened that the people we wanted – and also []race played a factor – they were all in the end pools . . . . We picked a jury already by the time we got to that. So on the last pools were basically there were some black people that we wanted. We never saw the jurors. She wouldn't let them come in front of us. They were sitting right behind us so all they had to do was walk around us. And I mean, it was outrageous . . . .
>
> . . . .
>
> Q: I understand your viewpoint on [the "paper strike"] issue, but I still don't understand if you were offered a mistrial ---
>
> A: Well, there was just some conversation. At least we got something from the way the jury was picked we got some black person there.
>
> Q: Right.
>
> A: It's not exactly who we wanted. But the people we wanted, there's no way we were gonna get them because if she threw everybody in the hopper, juror number 1 and juror number 100 would have the same chance of getting picked. Juror 100 never has a chance of getting picked because the

jury would have been picked already.
Q: Sir, and I understand that, but I'm going back to [Juror 342]. And I just don't understand ---
A: I just said that was one consideration because she was a black person, but I don't think it outweighs the fact that she was deaf.

(*Id.* at 92–95.) When pressed further by the State's PCR counsel to explain why he affirmatively argued to retain Juror 342, trial counsel stated, "I'm saying the reason was is [sic] because if that were a white woman there's no doubt I probably would have – I would have done it differently, but at least we got one black on the jury." (*Id.* at 97.)

If anything, trial counsel's transparent frustration with the jury selection process— which he challenged both on the theory that the State's use of peremptory strikes violated the rule established by the Supreme Court in *Batson* (*see* ECF No. 69-4 at 153–164), and on the basis of the "paper strike" method imposed by the trial judge (69-4 at 119–123)— would have provided an *incentive* to seek a mistrial, because a mistrial was the only viable route to selecting a new jury in a manner that comported with trial counsel's sense of fairness. In any event, it provides zero rationale for trial counsel's failure to seek Juror 342's removal from the panel, and simply does not support a finding that said failure was grounded in valid trial strategy. The PCR Court was unreasonable to make such a finding, and inexplicably ignored trial counsel's repeated testimony that Juror 342's race motived his decision.

To clarify, it was not impermissible for trial counsel to consider the fact that Juror 342 was black when deciding whether or not to seek her removal. However, the mere fact that Juror 342's minority race matched the race of his client did not supply trial counsel with a valid strategy to retain an incompetent juror. Taking into account the reality that Petitioner's conviction at the guilt phase was assured (*see* ECF No. 69-12 at 64, 78), trial

45

counsel knew that the "success" of the defense team's representation was dependent upon convincing at least one juror that the death penalty was not warranted. This task necessarily required jurors to assimilate and credit mitigation evidence presented at the sentencing phase, and to receive any discredit the defense was able to cast on the reliability or extremity of the aggravating facts established at the guilt phase. In this context, *there was no valid strategy* to retain a juror whose hearing was substantially impaired and trust to hope that she would vote against death simply because the defendant was black like her. Accordingly, the PCR Court's factual findings on this issue were unreasonable.

## 2. The PCR Court Unreasonably Applied Federal Law

The Court finds that the PCR Court unreasonably applied the well-established standard for ineffective assistance of counsel set forth in *Strickland* and its progeny. "An ineffective assistance claim has two components: A petitioner must show that counsel's performance was deficient, and that the deficiency prejudiced the defense." *Wiggins v. Smith*, 539 U.S. 510, 521 (2003) (citing *Strickland,* 466 U.S. at 687). "To establish deficient performance, a petitioner must demonstrate that counsel's representation 'fell below an objective standard of reasonableness.'" *Id.* (quoting *Strickland*, 466 U.S. at 688). Under this standard, a reviewing court must "conduct an objective review of [counsel's] performance, measured for 'reasonableness under prevailing professional norms,' which includes a context-dependent consideration of the challenged conduct as seen 'from counsel's perspective at the time,' ('Every effort must be made to eliminate the distorting effects of hindsight'). *Id.* at 523 (internal citations and alterations omitted) (quoting *Strickland*, 466 U.S. at 688, 89). When counsel's challenged conduct is purportedly

attributable to "tactical judgment," the reasons supporting that judgment must also be reasonable. *See id.* at 521 (holding that the measure of the reasonableness of counsel's justification for conducting limited investigation—namely, that it resulted from a "tactical judgment" not to present mitigating evidence and pursue an alternative strategy at sentencing—was whether the professional judgment supporting a limited investigation was itself reasonable). A petitioner establishes prejudice by demonstrating a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 695. This standard is satisfied where "there is a reasonable probability that at least one juror would have struck a different balance." *Wiggins*, 539 U.S. at 537. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.

The Court is clear-minded about its responsibility to apply a "strong presumption" that trial counsel's representation fell within the "wide range of reasonable professional assistance." *Richter*, 562 U.S. at 104 (citation and quotation marks omitted). Nonetheless, the Court finds that trial counsel's error in failing to seek Juror 342's excusal was of a seriousness as to show that he "was not functioning as the counsel guaranteed the [Petitioner] by the Sixth Amendment." *Id.* Accounting for the context—wherein trial counsel was already dissatisfied with the fairness of the jury selection—and counsel's contemporaneous perspective—which included real-time observation of Juror 342's faltering responses and equivocation about missing testimony—the decision to retain Juror 342 fell outside the bounds of reasonable professional judgment.

Because imposition of the death penalty is dependent upon unanimous agreement among jurors, *see* S.C. Code Ann. § 16-3-20(C), and in light of the State's rock-solid proof

at the guilt phase, trial counsel's primary role in this case was to convince at least one juror that the death penalty was unwarranted, whether due to the strength of mitigating circumstances or simply as an act of mercy. (*See* ECF No. 69-9 at 170–71 (trial judge instructing the jury that they could recommend a sentence of life in prison without parole "for any reason or for no reason at all").) To properly fulfill this role, he would have to ensure, at the very least, that each juror was physically able to understand and appreciate the full weight of any mitigating evidence presented by the defense, as well as any weaknesses in the State's aggravating evidence that counsel was able to reveal. Trial counsel abdicated this responsibility with regard to Juror 342.

In *Strickland*, the Supreme Court stated, "Prevailing norms of practice as reflected in American Bar Association standards and the like . . . are guides to determining what is reasonable[.]" 466 U.S. at 688. The ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases ("ABA Guidelines") applicable at the time of Petitioner's trial indicate, with respect to voir dire and jury selection:

> Counsel should be familiar with the precedents relating to questioning and challenging of potential jurors, including the procedures surrounding "death qualification" concerning any potential juror's beliefs about the death penalty. *Counsel should be familiar with techniques*: (1) for exposing those prospective jurors who would automatically impose the death penalty following a murder conviction or finding that the defendant is death-eligible, regardless of the individual circumstances of the case; (2) *for uncovering those prospective jurors who are unable to give meaningful consideration to mitigating evidence*; and (3) for rehabilitating potential jurors whose initial indications of opposition to the death penalty make them possibly excludable.

ABA Guidelines (rev. ed. 2003) § 10.10.2(B), *reprinted in* 31 Hofstra L. Rev. 913, 1049 (2003) (emphasis added). Admittedly, concerns regarding the extent of Juror 342's hearing loss, though addressed briefly in voir dire, came to a head outside the context of

jury selection. Moreover, the quoted section of the ABA Guidelines pertains most naturally to a defense counsel's duty to ferret out unwanted juror biases and predilections respecting capital punishment itself. However, the italicized portion of the guideline certainly suggests that one duty of a defense counsel in a capital case is to make affirmative efforts to identify jurors who are "unable" to properly consider mitigating evidence, a disqualifying characteristic that applies with equal force to a juror's physical infirmity as to her potential bias. Accordingly, the Court finds that trial counsel's failure to seek Juror 342's excusal was unreasonable under prevailing professional norms and evinced deficient performance of constitutional magnitude.

With respect to prejudice, Petitioner bears a heavy burden to demonstrate that counsel's errors deprived him of "a trial whose result is reliable," *Strickland*, 466 U.S. at 687, but the Court finds that Petitioner has satisfied that burden given trial counsel's inexplicable decision to not only fail to request Juror 342's removal, but to affirmatively argue for her retention. (*see* ECF No. 69-9 at 69–70, 75–76, 80–81.) As explained above, trial counsel's purpose was to ensure that each juror assimilated the defense's evidence in mitigation, along with any diminution of the aggravating evidence the defense was able to achieve through cross-examination. Intentionally leaving a hearing-impaired juror on the panel undermined this purpose, and casts doubt upon the reliability of the result because it weakens confidence that Juror 342 voted in favor of the death penalty as an outworking of her own deliberative choice, rather than simply following the crowd after having understood only insufficient portions of the testimony. Put simply, a competent jury is *fundamental*; allowing an incompetent juror to remain renders the result *fundamentally* unreliable. *See Richter*, 562 U.S. at 104.

In the context of a *Strickland* claim challenging the thoroughness of defense counsel's mitigation investigation, the Supreme Court has stated, "[when] assessing prejudice, we reweigh the evidence in aggravation against the totality of available mitigating evidence." *Wiggins*, 539 U.S. at 534. If this rubric is applied to the instant case (though the basis for Petitioner's *Strickland* claim differs from the claim at issue in *Wiggins*), it supports a finding of prejudice resulting from trial counsel's deficient performance. Specifically, this was *not* a case where the defense was bereft of meaningful mitigation, so the failure to ensure that *every* juror could take account of that mitigation injected prejudice into the proceedings.

Assistant trial counsel summarized the defense evidence in the sentencing phase as follows:

> Mr. Bryant had a remarkable history in prison. Mr. Bryant . . . was well liked in prison. He was very active in some programs. In school everybody I spoke with really liked the guy. He wasn't your typical prisoner. I mean, there was even testimony by somebody that he had intervened in some sort of a situation and disarmed another prisoner that had what they called a shank, which is a weapon. [The defense prison-adaptability expert] felt that he could successfully live for the rest of his life in prison.
>
> . . . .
>
> [T]here was more than prison adaptability. . . . There was also the family, and presenting the evidence that, I mean, this was a great family. These are wonderful people and they come across as wonderful people. It's a large family. They're all very dedicated. They're very caring. There's a tremendous amount of love. All and all I had well over 20. I sort of remember, I think, the number was 26, and the vast majority of those witnesses were family members. And my point is that [sic] show the jury— that the family would have incurred needless suffering. And then he didn't have—James Bryant did not have the perfect past, but he didn't have the worst past either. And that he had a religious commitment. There was a, I thought, some good things to say about his character.

(ECF No. 69-11 at 234–36.) Assistant trial counsel further indicated that one aspect of his

penalty phase theory was to demonstrate that the crime was out of character for Petitioner, that he had lived "a relatively okay life and something went wrong for about three minutes." (*Id.* at 263–64.) To that end, Petitioner's family and friends described him as a loving, considerate person, with a big heart (*see, e.g.*, ECF No. 69-7 at 182, 196, 225–26), as a person others trusted (*see, e.g.*, *id.* at 141, 189–90, 223), and as a person with no history of violence (*see, e.g.*, *id.* at 202–03, 212, 225). The case in mitigation also included testimony regarding repetitive beatings that Petitioner suffered at the hands of his strict disciplinarian father, beatings that "[got] out of hand" and "[were] extreme."[11] (*See, e.g.*, ECF No. 69-7 at 160–62, 177–79.) Multiple witnesses reflected that Petitioner was extremely remorseful for his crime.[12] (*See, e.g.*, ECF No. 69-7 at 203–04, 220, 226.) Though the State's case in aggravation was quite strong, the upshot of the fact that the defense possessed significant mitigating evidence is that "there is a reasonable probability" that Juror 342 may have "struck a different balance," if she heard and considered the mitigation in its entirety. *See Wiggins*, 539 U.S. at 537. Thus, the reliability of the death sentence is further undermined and the Court finds that Petitioner has satisfied the prejudice prong of the *Strickland* analysis.

When an ineffective assistance of counsel claim is plead in the context of a habeas petition, the petitioner must satisfy the highly deferential standards of 28 U.S.C. § 2254(d) and *Strickland* "in tandem," making the standard "doubly" difficult to surmount. *Richter*,

---

[11] *See also Penry v. Lynaugh*, 492 U.S. 302, 319 (1989) ("If the sentencer is to make an individualized assessment of the appropriateness of the death penalty, evidence about the defendant's background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background . . . may be less culpable than defendants who have no such excuse." (quotation marks and citation omitted)).

[12] This type of evidence has relevance at the penalty phase of capital cases because a juror's perception of a defendant's lack of remorse has been empirically associated with a preference for a death sentence. Dennis J. Devine & Christopher E. Kelly, <u>Life or Death: An Examination of Jury Sentencing with the Capital Jury Project Database</u>, 21 Psychol. Pub. Pol'y & L. 393, 395, 402 (2015) (discussing studies).

562 U.S. at 105. Applied here, the question becomes whether "there is any reasonable argument that counsel satisfied *Strickland*'s deferential standards" when he sought to retain Juror 342. *See id.* The Court finds that the unreasonableness of the PCR Court's determination on this *Strickland* claim is "beyond any possibility of fairminded disagreement." *See id.* at 103. In concluding that trial counsel was not ineffective, the PCR Court credited the failure to request Juror 342 be excused as a "strategic decision." (ECF No. 69-15 at 49) But in so doing, the PCR Court conflated a consideration that trial counsel stated "didn't come into it"—disapproval of alternate jurors—and a patently illogical reason *not* to seek a mistrial—disapproval of the jury selection process—with trial counsel's putatively "valid" reasons for retaining Juror 342. (*See id.*) In actual fact, the *one* consideration that trial counsel *repeatedly* cited as his motivation for keeping Juror 342 was her race, which would, of course, have no countervailing value as against her hearing incapacity. As trial counsel openly acknowledged at the PCR hearing, "I don't think [the fact that she was a black person] outweighs the fact that she was deaf." (ECF No. 69-12 at 95.) The PCR Court was objectively unreasonable to ignore trial counsel's stated reason for failing to seek Juror 342's removal, and to substitute more palatable reasons in deeming trial counsel's decisions to be valid strategy. Therefore, Petitioner's objections regarding Ground Two are sustained, the Report is rejected as to Ground Two, and the amended habeas petition is granted as to Ground Two.

## C. Ground Four

In Ground Four, Petitioner alleges he was denied the right to effective assistance of counsel as guaranteed by the Sixth Amendment when trial counsel offered defense theories inconsistent with each other and incompatible with their penalty phase

presentation. (ECF No. 65 at 12.) The PCR Court found that Petitioner failed to establish that trial counsel offered inconsistent theories during the guilt-innocence and sentencing phases of trial, stating:

> Based on counsel's testimony and review of the trial record, it is clear that counsel's overall strategy for the guilt phase was to hold the State to its Burden [sic] of proof. The defense strategy at the sentencing phase was to show the applicant was remorseful, would adapt well to prison, had become a religious man, had a good family, and a life sentence would be sufficient to punish him. *See Glass v. State*, 227 S.W.3d 463, 473 (Mo. 2007) (finding counsel's strategy was reasonable in arguing that the state had not presented evidence beyond a reasonable doubt to establish that defendant had deliberated prior to killing during guilt phase, and in the sentencing phase argued defendant was remorseful and that this one act was out of character).
>
> Because the two strategies were not inconsistent, the Applicant also fails to show that he was prejudiced by the interaction between the two strategies. Furthermore, even if the two strategies were inconsistent, Applicant fails to show that but for counsel's error, there was [sic] reasonable probability that the outcome at trial would have been different.

(ECF No. 69-15 at 53–54.) After extensive explication of the PCR proceedings pertaining to this claim, the Magistrate Judge concluded that Petitioner has failed to show: (1) that the PCR Court was unreasonable in finding that trial counsel's guilt-phase strategy was to hold the State to its burden of proof; (2) that the PCR Court was unreasonable in finding that this guilt-phase theory was not inconsistent with the penalty-phase strategy of showing Petitioner was remorseful, was adaptable to prison, was a religious man, had a good family, and would be sufficiently punished by a life sentence; and (3) the PCR Court's findings in this regard were contrary to the Supreme Court's articulation of effective assistance of counsel. (*See* ECF No. 86 at 54–68.)

Petitioner raises multiple objections to the Magistrate Judge's conclusions regarding Ground Four. First, Petitioner argues that the Report's recommendation "is somewhat confusing, as it appears be [sic] based on an inaccurate reframing of the

issue." (ECF No. 89 at 5.) Petitioner asserts that the Magistrate Judge artificially narrowed the parameters of the claim such that trial counsel's actions would not be found deficient so long as they can be described as "pointing out inconsistencies" in the State's case, or "holding the State to its burden." (*Id.*) Petitioner avers that this "narrow view" of the claim avoids the essential question of whether trial counsel's guilt-phase strategy allowed counsel to maintain credibility with the jury when they reached the penalty phase. (*Id.*)

This objection lacks merit. The Report's reasoning and recommendation with regard to Ground Four can hardly be deemed "confusing." The Magistrate Judge addressed the matter of trial counsel highlighting inconsistencies in the testimony of the State's witnesses because that is how trial counsel characterized his own role in the guilt phase. (*See* ECF No. 69-12 at 100–01.) Nothing about the Magistrate Judge's analysis can accurately be described as narrowing Petitioner's *Strickland* claim regarding inconsistent trial theories. The objection is overruled.

Second, Petitioner objects to the Report's "parsing and reframing of the record to support the PCR [C]ourt's conclusion that counsel had a guilt phase strategy at all." (ECF No. 89 at 5.) Petitioner juxtaposes various snippets of trial counsel's PCR testimony, and avers that the testimony includes "nakedly contradictory statements." (*Id.* at 5–6.) This objection lacks merit. The Court finds that the Magistrate Judge accurately discussed and fairly considered the relevant PCR testimony, and the objection is overruled.

Third, Petitioner objects to the Report's "implication that deficient performance by trial counsel can only be proved by trial counsel's admitting their own error." (*Id.* at 6.) In support of this assertion, Petitioner points to one sentence of the Report which states, "Petitioner does not identify any testimony by trial counsel reflecting a decision to

challenge the State's case for guilt." (ECF No. 86 at 63.) The Court finds that the Report includes no implication that counsel must admit ineffectiveness in order to substantiate a *Strickland* claim, and the objection is overruled.

Fourth, Petitioner objects to the Magistrate Judge's conclusion that trial counsel's cross-examination of Earl Deaton, an eye witness to the crime, was insufficient to show that the PCR Court was unreasonable in finding that trial counsel's guilt-phase strategy was to hold the State to its burden of proof. (*See* ECF No. 86 at 63–64.) Petitioner argues that the actual import of the cross-examination was to directly challenge James Bryant's presence at the scene of the crime, thereby implying that Petitioner was not the perpetrator, which was putatively inconsistent with trial counsel's sentencing-phase theory of remorse. (*See* ECF No. 89 at 6–7.)

At the end of the cross-examination, trial counsel asked Mr. Deaton, "did you identify the Defendant as a big man?" (ECF No. 69-4 at 231.) After receiving an affirmative response from Mr. Deaton, trial counsel next asked, "but you didn't identify him as James Nathaniel Bryant; is that correct?" (*Id.*) Mr. Deaton responded, "No, sir." (*Id.*) At the PCR hearing, trial counsel explained that he asked these questions in an attempt to show that Mr. Deaton had not actually seen as much as he claimed and had exaggerated his testimony. (*See* ECF No. 69-12 at 70.) The Court agrees with the Magistrate Judge's conclusion that this cross-examination falls short of demonstrating that the PCR Court was unreasonable in finding that the trial counsel's strategy at the guilt phase was to show inconsistencies in the State's evidence where possible, and ultimately to hold the State to its burden of proof beyond a reasonable doubt. The objection is overruled.

Fifth, Petitioner objects to the finding that "Petitioner failed to demonstrate that the

PCR [C]ourt's ruling was unreasonable, because the PCR [C]ourt did not find that counsel's guilt and innocence phase presentations were consistent, it found that they were 'not inconsistent.'" (ECF No. 89 at 7 (citing ECF No. 86 at 66).) Petitioner does not explain this one-sentence objection further. The relevant portion of the Magistrate Judge's Report highlights an important distinction and demonstrates sound reasoning with which the Court agrees. (*See* ECF No. 86 at 65–66 (stating, "Petitioner's argument is based on a mischaracterization of the PCR [C]ourt's findings—the PCR [C]ourt did not find trial counsel's strategies to be consistent; it found they were not inconsistent").) The objection is overruled.

Sixth, Petitioner objects to the Magistrate Judge's invocation of the clear and convincing evidence standard set forth in 28 U.S.C. § 2254(e)(1) in finding that Petitioner failed to show the PCR Court's factual determinations were unreasonable. (ECF No. 89 at 7–8.) Without legal support, Petitioner argues, "By its terms, that section describes the burden of proof borne by a petitioner at a hearing when he is presenting new evidence not heard by the state court on the claim." (*Id.* at 7.) Petitioner asserts that the Magistrate Judge was "bound to review the reasonableness of the district court's factual determinations 'in light of the evidence presented in the State court proceeding' per the express terms of 28 U.S.C. § 2254(d)(2)." (*Id.* at 7–8.)

Section 2254(e)(1) states:

In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

28 U.S.C. § 2254(e)(1). It is unclear why Petitioner asserts that this provision, "by its

terms," only applies in habeas proceedings where a petitioner is presenting new evidence at a hearing. However, to the extent the clear and convincing evidence standard is somehow incompatible with, or mutually exclusive with, the reasonableness analysis set forth in § 2254(d)(2)–to be clear, the Court makes no such declaration—the Court would note that its conclusions regarding the merits of Petitioner's various assertions that the PCR Court's findings of fact were unreasonable would remain the same. The objection is overruled.

Finally, Petitioner objects to the Magistrate Judge's conclusion that the PCR Court did not unreasonably apply existing Supreme Court precedent, which requires that defense counsel in a capital case must consider the guilt and penalty phases in conjunction when determining how best to proceed with trial strategy. (ECF No. 89 at 8 (citing *Florida v. Nixon*, 543 U.S. 175, 192 (2004).) This objection is general and conclusory, and fails to point the Court to any specific error in the Magistrate Judge's reasoning. The objection is overruled, the Report is adopted as to Ground Four, and Ground Four is denied and dismissed with prejudice.

### D. Ground Six

In Ground Six, Petitioner alleges he was denied the effective assistance of counsel when trial counsel acquiesced in the introduction of evidence relevant to an arbitrary factor during the sentencing phase of the trial. (ECF No. 65 at 15–16.) Here, Petitioner refers to the introduction of prison conditions evidence during the sentencing phase. The PCR Court found that trial counsel was not deficient for introducing evidence of prison conditions, and then failing to object when the solicitor cross-examined sentencing witnesses on this evidence after the door had been opened, stating:

This Court finds that Applicant's counsel was not deficient in raising issues of conditions of confinement. This trial occurred after *Kelly v. South Carolina*, 534 U.S. 246 (2002), but before *State v. Bowman*, 366 S.C. 485, 623 S.E.2d 378 (2005), *State v. Burkhart*, 371 S.C. 482, 640 S.E.2d 450 (2007), and prior to its own direct appeal *State v. Bryant*, 372 S.C. 305, 642 S.E.2d 582 (2007). The *Kelly* decision caused the state General Assembly to pass a law requiring life without parole to be charged in all death penalty cases. The *Bowman* decision held that prison conditions are not relevant to the question of whether a defendant should be sentenced to death and are inappropriate in the penalty phase of a capital case. After *Bowman*, [the] South Carolina Supreme Court held in *Burkhart* that it was reversible error for the solicitor to introduce the conditions evidence.

As noted previously, the *Bowman* and *Burkhart* decisions were not law at the time of this trial. It is clear that *Strickland* does not require counsel to anticipate changes in the [sic] developments in the law, and thus counsel is not required to have foreseen the State Supreme Court would subsequently call conditions evidence arbitrary. Therefore, this Court finds that given the time period and the then existing laws, the trial counsel was not deficient in presenting conditions evidence.

Applicant further contends that trial counsel was deficient in failing to object to testimony elicited by the state that focused on [sic] the jury's attention on irrelevant information, i.e. the conditions of the prison. Given the state of the law when this trial took place, applicant's counsel was correct that they would not have had a valid objection to the solicitor's limited responsive questioning. *See State v. Plath*, 281 S.C. 1, 313 S.E.2d 619 (1984) (holding that once the defense entered evidence about prison conditions, the State was allowed to submit evidence that life imprisonment was not the total abyss which the defendant portrayed it to be).

(ECF No. 69-15 at 50–51.)

In her Report, the Magistrate Judge discussed at length the South Carolina Supreme Court's decision in *Bowman v. State*, 809 S.E.2d 232 (S.C. 2018) ("*Bowman II*"), which was published after the PCR Court's decision in Petitioner's case, and which considered an ineffective assistance claim substantially similar to the claim raised in Ground Six. The Report explains:

In *Bowman II*, the court described Bowman's claim as one "that trial counsel was deficient in failing to object to the State's cross-examination of prison-

adaptability expert James Aiken[,]"[13] where "Aiken's testimony transitioned from a discussion of prison adaptability into one about general prison conditions . . . ." 809 S.E.2d at 234, 238. Bowman's trial counsel had testified that he elicited testimony from Aiken that Bowman "was not going to a 'kiddy camp' and that he would not be 'mollycoddled' [as] a strategic choice, and counsel acknowledged that he expected the solicitor to respond with questions about some of the less harsh conditions of confinement." *Id.* at 244. The solicitor did, in fact, elicit testimony from Aiken that prisoners could play basketball and exercise on their own and that they had access to libraries, movies, television, and other recreational activities. *Id.* at 238–39. The South Carolina Supreme Court discussed at length "the unique distinction South Carolina jurisprudence has drawn between evidence of prison adaptability, which [the court has] held is relevant and admissible, and evidence of general prison conditions, which [the court has] held is not." *Id.* at 241. Bowman's trial, like Petitioner's trial, occurred after *Plath* and *Kelly v. South Carolina*, 534 U.S. 246 (2002) but before the cases declaring evidence of prison conditions to be arbitrary under state law. *Id.* at 244.

(ECF No. 86 at 80–81.) The South Carolina Supreme Court stated, in *Bowman II*, that

Bowman's counsel's performance was not deficient and denied post-conviction relief,

stating:

> By myopically considering our state's nuanced and unique distinction between prison adaptability and general prison condition evidence, it might appear a finding of deficient representation is warranted.[FN] While we acknowledge that a close question is presented, in light of the state of the law at the time of Petitioner's trial and the narrowly tailored scope of the prison conditions evidence elicited, we find there is evidence in the record to support the PCR court's finding. There is evidence that counsel articulated a valid reason for employing this strategy, and because the State's response was proportional and confined to the topics to which counsel had opened the door, we affirm the finding that counsel was not deficient in failing to object to the State's line of questioning.

> FN. We reiterate that the prison adaptability versus general prison condition distinction is a creation of state law and is not mandated by the Eighth Amendment or other constitutional provision.

*Bowman II*, 809 S.E.2d at 244 (citations omitted).

---

[13] James Aiken also testified as a prison-adaptability expert for the defense at the sentencing phase of Petitioner's trial. His testimony in Petitioner's case, along with the "prison conditions" testimony of other defense mitigation witnesses, is subject to a challenge similar to that which was raised in *Bowman II*.

Petitioner first objects to the Magistrate Judge's conclusion that he did not offer a case in which the Supreme Court found trial counsel deficient for presenting or acquiescing to conditions of confinement evidence, nor did he offer a case that prison conditions evidence is unconstitutional in the sentencing phase of a capital case. (ECF No. 89 at 12–13.) Petitioner reiterates his citations to *California v. Brown*, 479 U.S. 538, 541 (1987), and *Lockett v. Ohio*, 438 U.S. 586, 604 (1978), which stand for the general proposition that a "capital defendant generally must be allowed to introduce any relevant mitigating evidence regarding his character or record and any of the circumstances of the offense." *Brown*, 479 U.S. at 541 (quotation marks and citations omitted). The Court agrees with the Magistrate Judge that Petitioner has not shown any well-established federal law that holds the introduction of prison conditions evidence to be ineffective assistance, or a freestanding constitutional violation in the penalty phase of a capital case. The objection is overruled.

Petitioner next objects that, regardless of the South Carolina Supreme Court's statement in *Bowman II,* that "the prison adaptability versus general prison condition distinction is a creation of state law and is not mandated by the Eighth Amendment or other constitutional provision," 809 S.E.2d at 244, n.7, prison conditions evidence is, nonetheless, an arbitrary factor that should not have been considered by the jury, and its introduction constituted ineffective assistance. (*See* ECF No. 89 at 13–14.) At the time of Petitioner's trial, South Carolina law had not yet called conditions of confinement evidence an arbitrary factor. The PCR Court was right to note that "*Strickland* does not require counsel to anticipate changes in . . . the law, and thus counsel is not required to have foreseen the State Supreme Court would subsequently call conditions evidence arbitrary."

(ECF No. 69-15 at 50–51.) Accordingly, the objection is overruled.

Finally, Petitioner objects to "[Report]'s finding that the PCR [C]ourt's order appropriately addressed the prejudice inquiry." (ECF No. 89 at 14.) However, as already indicated, the PCR Court found that trial counsel was not deficient in introducing the prison conditions evidence and in acquiescing to limited cross-examination once the defense opened the door. There was no need for the PCR Court to reach the prejudice prong of the *Strickland* inquiry under these circumstances. In sum, the Court finds that the PCR Court's ruling with regard to Ground Six did not involve an unreasonable application of clearly established federal law, nor was it based on an unreasonable determination of the facts. Therefore, the objection is overruled, the Report is adopted as to Ground Six, and Ground Six is denied and dismissed with prejudice.

## E. **Ground Eight**

In Ground Eight, Petitioner alleges he was denied the effective assistance of counsel when trial counsel failed to object to the solicitor's elicitation of evidence regarding a rumored escape attempt by prisoners on death row that did not involve Petitioner. (ECF No. 65 at 20–21.) During the sentencing phase of Petitioner's trial, the defense offered the testimony of institutional Chaplain Derward Van Bebber, in order to show that Petitioner demonstrated a sincere religious commitment during his pretrial incarceration. (ECF No. 69-8 at 47–48.) On cross-examination, the solicitor asked a question about the death row Easter service on April 18, 2003 being cancelled, to which Chaplain Van Bebber responded, "Yes, sir, it was. To my understanding it was cancelled because there was a rumor there was going to be an attempted escape; and so, the warden canceled that Easter sunrise service." (*Id.* at 52.) The solicitor then asked a few

follow up questions, in response to which Chaplain Van Bebber clarified that the rumored escape attempt was from death row, but that it did not necessarily involve the inmates that were going to the worship service. (*Id.* at 52–53.) On redirect examination, Chaplain Van Bebber testified that he was never suspicious that Petitioner had an ulterior motive for attending worship services, that "when he came to worship service he was always attentive" (in contrast to inmates who had motivations other than religious conviction for attending), and that there were many rumors in prison not all of which he took seriously. (*Id.* at 63–64.)

The PCR Court denied Petitioner's claim that trial counsel was ineffective for failing to object to the testimony regarding a rumored escape attempt, stating:

> Trial counsel was not deficient in failing to object to statements made by a witness about an alleged planned escape that did not implicate the Applicant. Trial counsel reasoned there was no harm because the witness quickly explained the escape evidence did not implicate Applicant. Furthermore, there was no prejudice in failing to object to information about the planned escape because of the egregious nature of this offense. Therefore, this Court finds the trial counsel was not ineffective in failing to object to testimony about an alleged planned escape not implicating the Applicant.

(ECF No. 69-15 at 53.) The Magistrate Judge concluded that there is support in the record for the PCR Court's factual findings (*see* ECF Nos. 69-11 at 243–45; 69-12 at 9–12 (setting forth assistant trial counsel's PCR testimony on this matter)), and that the PCR Court's application of *Strickland*, finding neither deficiency nor prejudice with respect to trial counsel's representation as to the escape attempt evidence, was not improper. (ECF No. 86 at 89–91.) The Court agrees.

First, Petitioner objects by arguing that the Report demands more than what the law requires when it faults Petitioner for failing to point to a Supreme Court Case that

addresses the improper introduction of evidence related to escape. (ECF No. 89 at 18.) Yet again, Petitioner cites the general rule from *Brown* and *Lockett*, that relevant mitigation evidence in capital sentencing proceedings is that evidence which pertains to the accused's character, his record, or the circumstances of the offense. (*See supra* at 60.) Petitioner argues that the admission of Chaplain Van Bebber's testimony regarding the escape plan introduced an arbitrary factor into the proceeding, and was therefore constitutionally improper. (ECF No. 89 at 18.)

The Court finds that the evidence in question pertained to a very limited line of questions, in which Chaplain Van Bebber called the potential escape plan a "rumor," and stated he was "not sure who was involved in that." (*See* ECF No. 69-8 at 52–53.) There was no insinuation that Petitioner was involved, or would be involved in such an escape attempt. The solicitor did not reference the matter during his closing argument. While irrelevant to the jury's deliberations during the sentencing phase, the brief mention of a rumor that an unidentified inmate(s) had planned an escape from death row, in order to explain why the Easter sunrise service itemized on Petitioner's religious services attendance record was cancelled, is not of constitutional magnitude such that trial counsel's failure to object was deficient under *Strickland*. Therefore, the PCR Court was not unreasonable in finding that trial counsel was not deficient. The objection lacks merit and is overruled.

Second, Petitioner objects to the Magistrate Judge's conclusion that the solicitor's cross-examination regarding the rumored escape plan was "legitimately related to the Solicitor's cross-examination of Van Bebber on the motives of prisoners attending his worship services, a concept on which trial counsel had questioned Van Bebber." (ECF

No. 86 at 90.) Petitioner argues that the introduction of possible escape plans of death row inmates into his capital sentencing proceeding was highly inflammatory, improper, and arbitrary. (ECF No. 89 at 18–19 (citing *Brooks v. Francis*, 716 F.2d 780 (11th Cir. 1983); *Hance v. Zant*, 696 F.2d 950 (11th Cir. 1983)).)

The cases cited by Petitioner in support of this objection are worlds apart from the "escape plan" evidence presented at Petitioner's trial. In the pre-AEDPA case of *Brooks*, the Eleventh Circuit vacated a habeas petitioner's death sentence due to gross prosecutorial misconduct in appealing to jurors' fears that the defendant might escape, inviting jurors to use the death penalty as a solution to crime in the streets, and appealing to the patriotism of jurors by likening a vote for the death penalty to the task of young military servicemen sent overseas to kill enemy soldiers. 716 F.2d at 788–89. The prosecutor's sentencing argument in *Brooks* appeared to be modeled on the sentencing argument in *Hance*, even using the same examples and turns of phrase, and the Eleventh Circuit based its finding of prosecutorial misconduct largely upon its reasoning and analysis in *Hance*. *See id.*

In *Hance*, the Eleventh Circuit held that the prosecutor's "fervent appeals to the fears and emotions of an already aroused jury was error of constitutional dimension." 696 F.2d at 951. The court noted that the prosecutor "tried to convince the jury that no one could feel save with [the defendant] in prison, close to one's home and family." *Id.* at 952. The prosecutor even made a direct parallel between the famous escape, two years earlier, of James Earl Ray from Brushy Mountain State Penitentiary in Tennessee, and the defendant's likelihood of escape, stating that if Ray escaped from what "was thought to be the most secure cell in the most secure prison in the United States. Why can't this

man escape from the Harris County Work Camp, or from Reidsville, for that matter?" *Id.* Whether the Magistrate Judge was or was not correct to note that the solicitor's questions regarding the rumored escape attempt were legitimately related to his cross-examination of Chaplain Van Bebber is beside the point. These cases have *no bearing* on the brief mention of a rumored escape plan unconnected to Petitioner at his sentencing hearing. Accordingly, the objection is overruled, the Report is adopted as to Ground Eight, and Ground Eight is denied and dismissed with prejudice.

### F. Analysis of the Procedurally-Barred Grounds: Five, Seven, and Nine

Petitioner concedes that the ineffective assistance of trial counsel claims raised in Grounds Five, Seven, and Nine were procedurally defaulted. (ECF No. 78 at 35, 46, 65.) In order to satisfy the exception set forth in *Martinez v. Ryan*, 566 U.S. 1 (2012), and obtain federal habeas review of the defaulted claims, Petitioner must establish that PCR counsel's failure to present those claims was itself ineffective assistance. Petitioner must then show that the underlying claims of ineffective assistance of trial counsel are substantial. The Magistrate Judge concluded that Petitioner has not met this burden as to Grounds Five, Seven, or Nine, that the procedural default of those grounds has not been overcome, and that summary judgment should be granted accordingly. (ECF No. 86 at 93–94.)

As an initial matter, the Magistrate Judge found that Petitioner failed to present any evidence regarding PCR counsel's recognition of, investigation of, or decision-making regarding any of the underlying *Strickland* claims. (*Id.* at 94.) Thus, in asserting that PCR counsel were deficient and that he was prejudiced as a result, Petitioner "[e]ssentially. . . argues that there can be no strategic reason for PCR counsel's alleged errors." (*Id.*)

Accounting for the strong presumption that PCR counsel's performance was reasonable, the Magistrate Judge reasoned that Petitioner has not satisfied his burden under *Martinez*. (*Id.* at 94–95 (citing *Burt v. Titlow*, 571 U.S. 12, 17 (2013) ("It should go without saying that the absence of evidence cannot overcome the 'strong presumption that counsel's conduct [fell] within the wide range of reasonable professional assistance.'" (modification in original) (quoting *Strickland*, 466 U.S. at 689))).) The Court agrees.

Petitioner objects to the Report's "determination that the deficient performance of PCR counsel was not plain from the record," stating simply, "[t]here can be no valid strategy for failing to raise a valid claim." (ECF No. 89 at 22.) He rejects the notion of "winnowing" issues in PCR proceedings, and asserts that "eliminating what Petitioner has now demonstrated are valid claims, would be per se deficiency in a capital case." (*Id.*) With respect, this objection is unresponsive to the Magistrate Judge's cogent explanation of how Petitioner failed to meet his burden under *Martinez*. The objection is conclusory and is overruled.

### 1. Ground Five

In Ground Five, Petitioner alleges he was denied the right to effective assistance of counsel when trial counsel unreasonably failed to object properly to the solicitor's alleged use of peremptory challenges on the basis of race in violation of *Batson*. (ECF No. 65 at 14.) The record shows that trial counsel challenged the State's peremptory strikes of four black females (ECF No. 69-4 at 153–54); the solicitor gave explanations for his use of peremptory strikes (*id.* at 154–61); the trial judge found the solicitor's stated reasons to be racially neutral and encouraged, indeed ordered, the defense to take extra time to see if they could show the solicitor's reasons to be mere pretext (*id.* at 161–64);

upon returning from a recess, trial counsel indicated that he had no argument to make as to pretext (*id.* at 165); Petitioner confirmed to the trial court that he had spoken with trial counsel and agreed with trial counsel's position (*id.* at 165–66); whereupon, the trial court denied the *Batson* motion (*id.* at 166). Petitioner contends that trial counsel, by declining to argue that the solicitor's justifications for the peremptory strikes were pretextual, unreasonably failed to *complete* a meritorious *Batson* objection. (ECF No. 89 at 9.)

After extensive analysis of the trial record and the relevant law, the Magistrate Judge concluded that Petitioner failed to show substantial deficiency or prejudice as to his Ground Five claim, and that the procedural bar should stand. (*See* ECF No. 86 at 95–108.) Petitioner raises a number of objections to this section of the Report, most of which are conclusory, or amount to simple disagreement with the Magistrate Judge, and do not require in depth treatment here. (*See* ECF No. 89 at 9–12.)

The gravamen of Petitioner's claim in Ground Five is that trial counsel was deficient by failing to understand and make an informed decision about the third-step of a *Batson* challenge—a showing of pretext—and that Petitioner suffered prejudice when trial counsel failed to make a comparative juror analysis between Juror 247, a black female who was struck by the State, and Juror 123, a white female who was seated on the jury. (*See* ECF No. 78 at 26–34.) With respect to the prejudice prong, Petitioner objects, *inter alia*, to the Magistrate Judge's "speculat[ion] that the reason the [s]olicitor retained the white juror, despite her extensive religion-based hesitation about the death penalty and struck the black one, who expressed almost none, was the 'pause' the black juror had about signing the death verdict." (ECF No. 89 at 11.) Petitioner further objects to the Magistrate Judge's reasoning: "It could be argued that Juror 247 expressed greater

hesitation since her hesitation was related to a critical part of the jury's process in recommending death, as compared to Juror 123's more general musings on the propriety of the death penalty." (*See* ECF No. 86 at 106.)

The Magistrate Judge's reasoning and conclusions in this regard were by no means "speculative." As she duly noted in the Report, after Juror 247 had been found qualified, the solicitor stated:

> [I]n regard to [Juror 247] she was qualified. I would like the record to note that when she was asked about signing the death penalty form that *she hesitated for what I perceived as being a fairly long period of time*. I just state that for the record in case there's some issue if she's struck.

(ECF No. 69-3 at 105 (emphasis added).) Here, the solicitor was referring to Juror 247's response to the trial judge's questions about signing the verdict form:

> Q: Okay, now once again could you, depending again on the facts and circumstances and the mitigating and aggravating circumstances and the law that I charged you, could you sign a verdict form that would sentence a Defendant to death, which in South Carolina is by lethal injection or electrocution?
> A: To death, I don't know.
> Q: Okay.
> A: That's kind of tough.

(*Id.* at 95.) Petitioner's *ex post* disagreement with the solicitor's evaluation of Juror 247's demeanor on the basis of a cold reading of the trial transcript is insufficient to undermine the Magistrate Judge's lucid analysis. After *de novo* review of the relevant portions of the record, the Court finds the Magistrate Judge's determinations to be sound, and the Report evinces no error. (*Id.*) Accordingly, the objections are overruled, the Report is adopted as to Ground Five, and the Court grants summary judgment as to Ground Five.

### 2. Ground Seven

In Ground Seven, Petitioner alleges he was denied the right to effective assistance

of counsel when trial counsel unreasonably failed to object to improper comments in the solicitor's closing arguments. (ECF No. 65 at 18.) Petitioner challenges two arguments made by the solicitor. First, he asserts that the solicitor advanced an argument that impaired the jury's ability to consider mitigating evidence, specifically:

> Now, I will concede that James Bryant maybe didn't have an ideal upbringing, but ladies and gentlemen, nobody is brought up by Ward and June Cleaver. They're not brought up by Bill Cosby. That's fiction. Everybody, everybody has something in their background that shouldn't have happened, something about the way they were raised, something about their parents, *but consider this, and this is important, where is the connection between whatever problem he had being raised by his father who drank too much and who tried to exert discipline on his children, what is the connection between that which occurred back up until the time he leaves home at 17 or something and his murder of a law enforcement over a decade later? Has anybody gotten up here and said because of this he did that? It's just not there. There's no connection.* What he did he did of his own free will and accord because he wanted to. You all hadn't heard about any kind of mental problem that he's got that would cause him to do this. It's not there. He chose to drive a car knowing he had no driver's license. He chose to run a stop sign while he was driving that car with no driver's license. He chose to resist arrest when Officer Lyden tried to put him under arrest for doing exactly what he had been doing wrong and he knew it. He knew he had no license. He knew the stop sign was there and he didn't— he didn't stop.

(ECF No. 69-9 at 127–28 (emphasis added).)[14] Second, Petitioner avers that the solicitor capitalized on inadmissible evidence regarding conditions of confinement and improperly compared the victim's death to the prospect of Petitioner's life in prison:

> First of all you've got three meals a day supervised by a dietician. You've got medical and dental care for whatever goes wrong for the rest of your life. You get your clothing given to you. You can work or not work at your discretion. If you work you get paid. If you don't feel like working there's 12 hours of television you can watch a day. You have a canteen you can go to. Your family can send you money or you can work and get that money. You can go to the canteen. You can buy cigarettes, candy, Coca-Cola, potato chips, snacks, whatever you want. You get tired of eating you can to go [sic] the library and you can read a book or two. You can get your walk-man,

---

[14] Petitioner challenges the italicized portion of the solicitor's argument as being improper. (*See* ECF No. 65 at 18.) The remainder of the quotation is provided for context.

listen to whatever music you want to listen to, go to a movie. They've got an athletic director there, you know, maybe you're tired of reading, don't want to work, "Let's go play handball. Let's play softball." They've got intramural teams, you know, "Here's our dorm we can play your dorm, you know, let's play a game here." They've got an athletic director supervising all that, and in the meantime Corporal Dennis Lyden is in his grave and that's why life in prison is not an acceptable alternative punishment to the death penalty in this case.

(ECF No. 69-9 at 129–30.) The Magistrate Judge concluded that Petitioner had not made a substantial showing that trial counsel was deficient in failing to object to portions of the State's closing argument (ECF No. 86 at 110–12), nor had Petitioner made a substantial showing that he was prejudiced in that the result of the proceeding would have been different if trial counsel had objected (*Id.* at 112–16.) Therefore, the Magistrate Judge found that Petitioner could not overcome the procedural default of Ground Seven. (*Id.* at 116.)

With respect to the prejudice prong, the Magistrate Judge took issue with Petitioner's characterization of the solicitor's argument regarding Petitioner's personal background. Rather than interpreting the argument as an instruction to the jury to disregard mitigating evidence unless they found a nexus between that evidence and the crime, the Magistrate Judge concluded that the argument was part of the solicitor's contention that Petitioner murdered the victim of his own free well. (*Id.* at 113 (citing *United States v. Rodriguez*, 581 F.3d 775, 799 (8th Cir. 2009)).) The undersigned agrees that the argument was not improper in the first instance. The Magistrate Judge further found, "[i]t is not clear that the [s]olicitor's reference to [the victim's] future in a grave as compared to Petitioner's future in prison was improper." (*Id.* at 114 (citing *United States v. Umaña*, 750 F.3d 320, 353 (4th Cir. 2014) ("We do not believe that it was error, much less plain error, for the prosecutor to have compared Umaña's potential prison sentence

with the plight of the victims.")).) While it is not impossible for this type of argument by a prosecutor to stray into impermissible territory, the solicitor's argument at issue here was not improper and represents "'the sort of thrust and parry in which attorneys typically engage in the course of their last chance to persuade a jury.'" *Umaña*, 750 F.3d at 353 (quoting *United States v. Runyon*, 707 F.3d 475, 513 (4th Cir. 2013)).

As is the case with Petitioner's objections regarding Ground Five, most of the objections raised with respect to Ground Seven are conclusory, or amount to simple disagreement with the Magistrate Judge. (*See* ECF No. 89 at 14–17.) However, the Court will specifically address Petitioner's assertion that the Report "overlooks the fact that just a month prior to Petitioner's trial, the South Carolina Supreme Court had found counsel ineffective for failing to object to [a prosecutor's argument comparing the worthiness of the defendant's life to that of the victim]." (*See id.* at 16–17 (citing *Hall v. Catoe*, 601 S.E.2d 335 (S.C. 2004)).) *Hall* is distinguishable. In that case, the South Carolina Supreme Court held that Hall's counsel's failure to object to the following statement "allowed the solicitor to charge the jury with an arbitrary, misconceived sentencing analysis, violating Hall's right to due process":

> I am talking about values, because a jury verdict is a statement of values. And I am not talking about dollars and cents as far as what the [lives of the two girls were] worth, but nevertheless it is a question of values. What are the lives of these two girls worth? Are they worth the life of this man, the psychopath, this killer who stabs and stabs and kills, and rapes and kidnaps.

*Hall*, 601 S.E.2d at 339. The prosecutor's argument in *Hall* was impermissible because it encouraged the jury to make comparative judgments about the worth of a defendant's life as against the worth of the lives of his victims. *See id.* at 362–63 (declining to extend the previous decision of *Humphries v. State*, 570 S.E.2d 160, 168 (S.C. 2002), where the

court held that a solicitor comparing the lives of a criminal defendant with that of the victim was permissible victim impact evidence). In the instant case, the solicitor's cursory reference to the victim lying in his grave does not invoke the same kind of direct comparison of worth that the court found problematic in *Hall*.

After *de novo* review, the Court finds Petitioner's objections insufficient to displace the sound reasoning and conclusions of the Magistrate Judge regarding Ground Seven. Petitioner has not satisfied the requirements of *Martinez* to excuse the procedural default of this claim. Accordingly, the objections are overruled, the Report is adopted as to Ground Seven, and the Court grants summary judgment as to Ground Seven.

### 3. Ground Nine

In Ground Nine, Petitioner alleges he was denied the right to effective assistance of counsel when trial counsel failed to object to the trial court's erroneous definition of mitigating evidence. (ECF No. 65 at 22.) Here, Petitioner challenges a portion of the trial judge's instruction to the jury regarding non-statutory mitigation evidence: "Okay, these non-statutory mitigating circumstances, as I indicated, are not by statute, but is [sic] one which the Defendant claims serves the same purpose, that is to reduce the degree of his guilt of the offense." (ECF No. 69-9 at 175–76.) Petitioner contends that this instruction was a misstatement of the law because, "There is no requirement that non-statutory mitigating circumstances demonstrate any link between mitigating evidence and the crime, much less prove that it reduces the extent of [Petitioner's] legal culpability, which has by definition already been decided in the guilt phase." (ECF No. 78 at 62.)

The Magistrate Judge concluded that, when considered in context of the entire jury charge, the particular portion that Petitioner challenges was not erroneous. (ECF No. 86

at 116–17.) Immediately prior to the challenged portion of the charge, the trial judge stated:

> Now, mitigating circumstances is [sic] neither justification nor excuse for the murder. It simply lessens the degree of one's guilt, that is it makes them less blame-worthy or less culpable. You may consider any non-statutory mitigating circumstances and you may also consider the statutory mitigating circumstances that has [sic] been listed for you, that is that the Defendant has no significant history of prior criminal convictions involving the use of violence against another person. Now, these non-statutory mitigating circumstances are not listed on this form. They're not required to be, just the statutory mitigating circumstances.

(ECF No. 69-9 at 175.) Moreover, the trial judge instructed the jury that they could "sentence the Defendant to life in prison without parole for any reason or for no reason at all. This is what has been traditionally referred to as a recommendation of mercy . . . ." (*Id.* at 176.) The Magistrate Judge discussed a South Carolina Supreme Court decision, wherein the court considered an almost identical jury charge regarding mitigating circumstances and held that the defense counsel was not ineffective for failing to object to the charge. (*See* ECF No. 86 at 117–19, n.24–25 (citing *Sigmon v. State*, 742 S.E.2d 394, 401–02 (S.C. 2013)).) Finally, the Magistrate Judge found that where there was no error in the trial court's jury instructions, trial counsel had no reason to object, that Petitioner failed to make a substantial showing as to either prong of *Strickland*, and that Petitioner had not overcome the procedural default of his claim in Ground Nine. (*Id.* at 119–20.)

Petitioner objects, arguing that defining mitigation as a factor that reduces "the degree of guilt" is simply incorrect, and this erroneous definition was not cured by the trial judge's other statements in context. (*See* ECF No. 89 at 19–20.) Petitioner further argues that the Magistrate Judge's citation to *Sigmon v. State* is inapposite because the court in

that case considered "whether a similar instruction improperly differentiated between statutory and non-statutory mitigating circumstances in a way that made the jury think that statutory mitigation should carry more weight." (*Id.* at 20.)

With respect, while it is true that the issue raised in *Sigmon* was phrased in slightly different fashion—namely, whether "trial counsel was ineffective for failing to object to the trial court's instructions on non-statutory mitigating circumstances *because the charge disparaged the legitimacy of this type of evidence*," 742 S.E.2d at 401 (emphasis added)—the language of the jury charge was nearly identical to the charge at issue here, and the South Carolina Supreme Court's analysis was right on point to the arguments that Petitioner has raised in support of his claim. *See id.* ("Sigmon argues the instructions *improperly narrowed the evidence the jury would consider in mitigation to factors relating specifically to the crime*, to the exclusion of other evidence presented, such as Sigmon's adaptability to prison life, acceptance of responsibility for his actions, and remorse for the crimes." (emphasis added)). Moreover, the *Sigmon* court reasoned that the language challenged by the defendant should not be analyzed in isolation, but in the context of the jury charge as a whole, which instructed the jury that they could consider:

> whether the defendant should be sentenced to life imprisonment for any reason, or for no reason at all. . . . In other words you may choose a sentence of life imprisonment if you find a statutory or non-statutory mitigating circumstance, or you may choose a sentence of life imprisonment as an act of mercy.

*Id.* at 401–02. Again, this contextual language is substantially similar to the trial judge's instruction in the instant case. The Court finds that the *Sigmon* decision is highly relevant to the viability of Petitioner's challenge to the jury charge in this case, and militates toward a finding that trial counsel was not ineffective for failing to object. Accordingly, the Court

overrules Petitioner's objections, adopts the Report as to Ground Nine, and grants summary judgment as to Ground Nine.

## CONCLUSION

In light of the foregoing analysis, the Court overrules Petitioner's objections with respect to Grounds Four through Nine of the amended petition, **ACCEPTS** the Magistrate Judge's Report as to Grounds Four through Nine, sustains Petitioner's objections with respect to Grounds One and Two of the amended petition, and **REJECTS** the Report as to Grounds One and Two. (ECF No. 86.) Grounds Three and Ten are **DISMISSED** as moot, having been expressly abandoned by Petitioner. Therefore, the Court **GRANTS** Respondents' motion for summary judgment as to Grounds Four through Nine, and **DENIES** the motion as to Grounds One and Two. (ECF No. 73.) Consequently, the Court **GRANTS** Petitioner's amended petition for writ of habeas corpus as to Grounds One and Two (ECF No. 65), and **VACATES** his death sentence. The Court suggests that a resentencing trial in State court occur within sixty (60) days or as soon as practical thereafter.

**IT IS SO ORDERED.**

/s/ Bruce Howe Hendricks
United States District Judge

March 19, 2019
Charleston, South Carolina